Filed 12/3/13  In re C.M. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re C.M., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E058036 |
| Plaintiff and Respondent, | (Super.Ct.No. J227010) |
| v. | **ORDER MODIFYING OPINION** |
| L.M. et al., | [NO CHANGE IN JUDGMENT] |
| Defendants and Appellants. | |

THE COURT:

It is ordered that the opinion filed on November 20, 2013, be modified as follows:

On page 25, the paragraph that begins, "Parents exposit *In re Amber M.* (2002)

103 Cal.App.4th 681[,]" is modified to read:

"Parents exposit *In re Amber M.* (2002) 103 Cal.App.4th 681 and *In re Scott B.*

(2010) 188 Cal.App.4th 452 (*Scott B.*) in support of their contention the parental

beneficial relationship exception was applicable here.  We find both decisions

1

distinguishable.  In *Amber M.*, several professionals expressed conclusions that the mother and the minors were strongly bonded and that interfering with their relationships could be harmful to the minors.  A psychologist who had conducted a bonding study between Amber and the mother found that they shared a "'primary attachment'" and "'primary maternal relationship'" that could be detrimental to sever.  Amber's therapist believed she and the mother had a strong bond and that it was important their relationship continue.  (*Amber M.*, at p. 689.)  The court appointed special advocate (CASA) for one of the other minors testified that minor "loved and missed Mother and had difficulty separating from her."  (*Ibid.*)  The CASA disagreed with the Agency's recommendation of adoption.  (*Id.* at pp. 689-690.)  Thus, unlike the instant case there was overwhelming evidence the mother and the minors had a strong relationship that would detrimental to minors to sever.

Except for this modification, the opinion remains unchanged.  The modification does not affect a change in the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


MILLER
                                                                                            J.

We concur:


McKINSTER
                    Acting P. J.


RICHLI
                    J.


2

Filed 11/20/13  In re C.M. CA4/2 (unmodified version)

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re C.M., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>L.M. et al.,<br><br>    Defendants and Appellants. | E058036<br><br>(Super.Ct.No. J227010)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Cheryl C. Kersey, Judge.  Affirmed.

Rosemary Bishop, under appointment by the Court of Appeal, for Defendant and Appellant L.M.

Richard L. Knight, under appointment by the Court of Appeal, for Defendant and Appellant S.M.

1

Jean-Rene Basle, County Counsel, Kristina M. Robb, Deputy County Counsel for Plaintiff and Respondent.

No appearance for Minor.

On April 30, 2009, plaintiff and respondent San Bernardino Department of Children and Family Services (the department) took C.M. (minor; born January 2005) into protective custody, along with minor's siblings K.M. (born February 2006), and C.J.M. (born March 2008), after receiving a call from a deputy sheriff reporting defendant and appellant S.M. (mother) had been involuntarily institutionalized pursuant to Welfare and Institutions Code section 5150.[1]  Defendant and appellant L.M. (father) had been diagnosed with Post Traumatic Stress Disorder (PTSD) and Schizophrenia.  The home was found in a deplorable state.  The department placed minor with the prospective adoptive parents (PAPs) on September 23, 2009.

On January 27, 2011, the juvenile court terminated the reunification services of mother and father (parents) as to minor.  On January 27, 2012, the juvenile court returned custody of K.M. and C.J.M. to parents and dismissed the dependency as to K.M. and C.J.M.  On January 29, 2013, the juvenile court terminated parents' parental rights to minor and ordered adoption as the permanent plan.  Parents appeal contending the court erred in declining to apply the beneficial parent relationship and sibling relationship exceptions to the termination of parental rights.  We affirm the judgment.

---

[1]  All further statutory references are to the to Welfare and Institutions Code unless otherwise indicated.

2

**FACTUAL AND PROCEDURAL HISTORY**

A sheriff's deputy "reported he was called by an informant that [parents'] home was substandard and a risk to the children's safety, health, and well being." The deputy "reported that the home was strewn with filthy clothing; the home smelled of urine and feces, there [was] dog feces inside the home and about the home. The children we[r]e walking about the home and tracking through the feces with bare feet. There were no provisions for the children." Minor was observed squatting to urinate in the living room. C.J.M. had a diaper rash and appeared uncared for. The home had very little food and no milk. Father's psychiatric medication was found in the garage within reach of the children. Minor had been diagnosed as autistic, but parents had not obtained any services for her.

Mother had been involuntarily committed for thoughts of suicide and depression. Mother reported incidents of domestic violence at the hands of father. Father admitted the domestic violence charges: "'I get energy in my arm—like electricity and—yes, I have domestic charges against me.'" "'[T]here is a plan that guides me, I believed that—I hear things swirling in my head—I am guided by a plan.'" Father had multiple arrests and convictions for domestic violence and was currently on probation. Father had served over three years in the military with tours of duty in both Iraq and Afghanistan. While in Iraq, father suffered from a combat blast wave and sustained shrapnel injuries in a mortar attack for which he received a purple heart. He was diagnosed with PTSD and Schizophrenia.

The department filed a section 300 juvenile dependency petition alleging mother and father suffered from mental illnesses that prohibited them from properly caring for the children (B-1 & B-2), had maintained substandard living arrangements for the children (B-3 & B-4), had engaged in domestic violence in the presence of the children (B-5 & B-6), and mother was hospitalized (G-7).[2] In the jurisdiction and disposition report filed May 26, 2009, the social worker noted, "The most significant strength is the parents['] love for their children. The family has no substantiated priors. In the past the parents have met the children's needs. The family has stable housing and their rent is reduced through Section 8. The parents have made improvements on the home. When the undersigned made an unannounced visit to the home the undersigned noted that the floors were clean, the carpet was clean, the home was free from an unpleasant odor and the clothes had been washed. The home was still messy, but a major visible improvement was noted from the initial unsanitary conditions noted in the detention report. The parents are receptive to [department] recommendations."

Mother had enrolled in behavioral services. "The parents' progress and initiative has been noted." "The parents have great insight and are committed to successfully reunify." Parents' first visit with minor occurred on May 22, 2009: "The visit went well. The parents were attentive and interacted appropriately with the children. The children appeared comfortable in their presence and happy." "The mother has had to act in the capacity of a conservator for the father instead of a wife. It appears that the mother has to

---

[2] The department later withdrew the G-7 allegation, apparently when mother was released.

monitor the father daily to ensure his medication is effective and ensure he is receiving appropriate services. In the midst of mother's care for the father she . . . fell into a depression which has affected her ability to adequately parent." "The parents both desire to be good parents and they love their children. It is the undersigned's impression that through counseling, ongoing psychiatric care, psychotropic medication[,] and a parenting class the parents can successful[ly] reunify."

The juvenile court sustained the allegations in the petition, as amended, on June 5, 2009. The court removed minors from parents' custody and ordered twice weekly visitation to be liberalized at the discretion of the social worker.

In the status review report filed November 25, 2009, the social worker reported she had been informed by the Veterans' Administration (VA) father required intense monitoring. Father was participating in a program with the VA for persons with PTSD and Schizophrenia. He had "many appointments with mental health care professionals." It was recommended mother not work outside the home so that she could care for father; she "is very organized and acts as an effective advocate for her husband's needs." Mother was working on obtaining permanent disability for father due to his service injury in Iraq.

Although all the children had initially been placed in the same foster home, minor was removed and placed with the PAPs on September 23, 2009, due to her "frequent tantrums, particularly in public as well as aggressive tendencies toward her sisters." "It has been observed that [K.M.] appeared nervous or stressed when [minor] was placed in the same home. Since [minor] has left [K.M.] is more 'carefree' and sleeps through the

5

night more consistently." When moved, minor's behavior improved dramatically. The foster families "have formed a close friendship" allowing the siblings to have ample time together in addition to the time scheduled for parental visits.

Parents completed a parenting class and mother had nearly completed her approved counseling sessions. Father maintained ongoing mental health services and mother had regularly scheduled psychiatry appointments.

Parents had twice weekly monitored visits with the children: "The parents have rarely missed a visit. When they have had to cancel a visit, it is due to an important appointment for [father] at the VA hospital. . . . The family visits appear to be appropriate. There is some concern, however, that mother and father have difficulty in effectively re-directing the children. The children tend to do what they want to without listening to instruction from the parents. There has been minute improvement over the months; however, it appears that more time is required for [parents] to put effective parenting techniques into practice." Mother "attempts to provide educational toys and activities during her visits with the children. She also provides healthy snacks. It has been reported that family visits with father present are more hectic and less controlled. [Father] has difficulty remaining during the entire [two]-hour visit; consequently, he goes outside for minutes at a time prior to rejoining the family."

"There is no doubt that [mother] loves her family. She has a tremendous task ahead of her in order to care for them. Despite her strengths, [mother] is not yet ready to independently care for her mentally ill husband, two developmentally delayed children

6

and a toddler."[3]  "With a gradual transition, it is this social worker's belief that [mother] can eventually juggle all the components of her high needs family and thus, succeed as a parent."

On December 7, 2009, the juvenile court found parents had made moderate progress and that there was a substantial probability the children would be returned to parents' custody within six months.  The court authorized the social worker to transition visitation to unsupervised as deemed appropriate; Mother was to be present for unsupervised visits.

In the status review report filed May 25, 2010, the social worker recommended, "Six more months of services [to] provide time for the family to transition to unsupervised visits, which would allow for a better assessment of the [parents'] ability to parent and care for their children, and build their relationship with their children."  The recommendation included twice weekly one-hour visits, one supervised and one unsupervised.

Parents had acquired a four-bedroom, two-bathroom house.  There were beds and dressers for each child.  The house appeared appropriate and clean.  Parents had installed locks on the refrigerator and some cabinets.  Father remained medication compliant. Parents had complied with their case plan.

---

[3]  K.M. also showed some intellectual developmental delays.

7

Parents had twice weekly monitored visits: "The parents have rarely missed a visit. When a visit has been cancelled it has been due to [father] having a conflicting appointment at the VA hospital." They were 25-30 minutes late to one visit on March 22, 2010, arriving only after the foster parents had left. "The family visits appear to be appropriate; however[,] there is still concern that [parents] have some difficulty redirecting the children when they misbehave. It has been observed . . . that the children tend to do as they please in the visits. There are times when [mother] will intervene and redirect the children; however[,] intervention is usually done as a last resort."

Minor was receiving Early Childhood SART services through Victor Community Support Services. A clinician reported minor's "diagnosis of Autism is being re-evaluated at this time." Minor "does not appear to meet diagnostic criteria for Autism, and . . . her delays might have been caused by neglect." This was because minor had made such substantial progress since treatment began.[4] Minor's "behaviors have improved drastically. The frequent tantrums that [minor] displayed, especially when in public have reduced to the point that they almost never occur." It was noted that without a structured environment, minor would "'dysregulate.'"

Minor "has formed a healthy bond with the [foster] family. [Foster mother] has indicated that '[minor] has become a part of the family' and that they 'love her as if she were their own child'." The foster parents of the siblings have continued "to maintain a

---

[4] Subsequent testing in September 2010 failed to result in any rediagnosis. The social worker opined, "there appear to be some fundamental biases against the parents that exist on the part of the service provider."

close relationship with each other, which allows all three children to spend time with each other frequently throughout the week. The two foster families attend the same church, which further allows all three girls to interact with one another."

On June 7, 2010, the juvenile court ordered parents to undergo psychological evaluations as the department and minor's counsel were concerned regarding the proposed unsupervised visitation. On July 7, 2010, the court found parents' progress toward alleviating or mitigating the cause necessitating placement had been moderate to substantial. It found a substantial probability the children would be returned to parents' custody within six months.

In the interim review report filed August 23, 2010, the social worker recommended unsupervised visitation including overnight, weekend, and holiday visitation. "Since being assigned to the matter, the undersigned has supervised the majority of the visits between the children and their parents both in an office setting and in public. Results of the psychological evaluations support the observations made by the undersigned in that [parents] present as being very loving and attentive parents to their children who pose no risk of detriment to the children should they be returned to their care. . . . [Parents] have demonstrated that they have the ability to manage their children in a public setting and that they are attentive to the children's needs."

Parents "work together to balance the needs of the children for individual attention while maintaining the sense that they are all a family." The psychologist, Heidi Knipe-Laird, Ph.D., concluded parents do not pose a danger or risk to the children if reunified: "Dr. Laird notes that the two carry a heavy burden together, but that they have learned the

skills to assess their needs and to ask for appropriate assistance as they provide a safe and nurturing home for their children. [¶] [Mother] showed that she has enjoyed satisfaction and validation from parenting her children, is attuned to their needs, and has a grasp of the differences in their personalities. . . . Her parenting approaches reflected a strong commitment to parenting with nurturance, open communication, and a style of discipline that relies on frequent praise, consistent limit setting[,] and non-punitive consequencing." The social worker did note parents gave perhaps too much leeway when it came to minor's behavior.

On August 25, 2010, the juvenile court granted the request for twice weekly unsupervised visitation including overnight, weekend, and holiday visitation. In the status review report filed October 25, 2010, the social worker recommended the court find parents had made substantial progress and minors be returned to their custody while being maintained as dependents at home with family maintenance services. Minor was found to be eligible for IRC services throughout her lifetime, respite care to relieve her parents for a period of time monthly, education advocacy services, behavior modification therapy, in-home and center based services, parent support, applied behavioral analysis, one-on-one services, equipment, and Medi-Cal and Medicaid waiver programs. Parents had been having two-hour visits twice weekly. Father was comfortable watching one of the children, okay with two, but found minor wild and worried for her safety. He was observed to be less able to effectively parent than mother. Parents were expecting the birth of a fourth child.

10

The psychologist's evaluations of parents were attached to the report. The clinician conducted five in-home service visits. The clinician "reports that [parents] appear to enjoy playing and interacting with their children and verbalize praise and enthusiasm. [Mother] is described as being nurturing of the children and both parents have been open to parenting suggestions." "In the opinion of this evaluator, [father] does not present a danger to his children, and his children are not at risk of detriment if reunified with him and [mother]. [Parents] carry a heavy burden together, but it is the sense of the evaluator that the couple has learned the skills to assess their needs, and ask for appropriate assistance as they provide a safe and nurturing home for their children." Nevertheless, father's chronic symptoms of PTSD and Schizophrenia suggested he posed a "very real risk" for suicide.

"In reviewing [mother's] past choices and decisions, her judgment has obviously been good. Her responses in the clinical interview showed genuine insight."

"This evaluation was performed in order to determine whether [mother] is likely to be able to parent her three children effectively. The test results discussed above indicate that [mother] certainly has the intellectual capacity to provide nurturing and safe parenting. Her level of cognitive functioning definitely enables her to recognize and solve practical problems, and meet the demands of household maintenance." "It is the strong impression of this evaluator that [mother's] children are not at risk of detriment if they reunified with her and . . . father. This young family faces formidable challenges, and it is recommended that they receive appropriate help[.]"

On October 29, 2010, the court ordered unsupervised visitation including overnight and extended visits as appropriate, as recommended by the social worker.

In the addendum report filed January 27, 2011, the social worker indicated that since the prior hearing, parents had extended visits with the children; during this time, Mother gave birth to a baby girl. "Over the extended visit period, the children . . . have spent up to a week and a half together with their parents. In that time it has been observed that [minor's] special needs (related to her diagnosis of autism) are so great that her extended presence in the home creates a situation that is almost unmanageable for her parents." Father shared he had difficulty setting limits for minor; mother expressed need for additional behavioral support to meet minor's needs; it was anticipated there would be family support, which had not manifested. Although minor had shown continued improvement, she exhibited problem behavior, which K.M. began mimicking. "Although there are behavioral support services available, it does not appear that this will be enough to provide the level of stability in the home that would be desired to facilitate a sound reunification for all the children." The department recommended return of K.M. and C.J.M. to parent's custody as continued dependents of the juvenile court and family maintenance services. The social worker recommended terminating reunification services as to minor.

At the hearing on January 27, 2011, parents submitted on the report. Mother was "fine with that recommendation. Considering the challenges with [minor], she is fine. The intended goal will still be to return [minor] to her parents at some point in the future. And the visitation order that is suggested by the department works very well for the

parents." The juvenile court found parents had made substantial progress, returned minor's siblings to parents' custody, but found minor's special needs outweighed "the capacity of the parents' ability to meet her needs and those of the other minors in the home." The court found minor was not adoptable, that no adult was available to become her legal guardian, terminated reunification services as to minor, and found termination of parental rights was not in minor's best interests with the permanent plan ordered to be long-term foster care with the goal of return to the home. The court ordered visits with minor, parents, and siblings to be unsupervised a minimum of twice per month for two hours with weekends, overnights, and holidays as appropriate and arranged by social worker.

In the status review report filed July 18, 2011, the social worker recommended minor's siblings remain dependents of the court with family maintenance services. The social worker recommended minor be maintained in her current placement. The social worker found parents maintained the household in a manner consistent with community standards. The home was appropriate and healthy. "The children's need for a safe and stable environment is consistently met, despite some of the struggles that the parents have in dealing with the issues related to [father's] traumatic brain injuries and the resulting mental health concerns." The social worker observed parents had welcomed the social worker and assigned services providers "into their home and they have wholeheartedly participated to the extent deemed appropriate for their children's needs." Father had completed probation and there were no further reports of domestic violence.

The therapist believed minor regressed as a result of having spent a week in parents' home. K.M. would continue to mimic minor's behavior problems when minor was around. "Visits in the biological family home began taking place for approximately two to four hour periods, and then moved to overnight and then weekend visits. It was determined early on that [t]he extended visits with the parents and siblings tended to have somewhat of a negative effect on [minor's] behavioral stability once she returned to placement. The transition from the foster family's home-routine, to the biological family's home-routine, and then back again, exacerbated the dysfunctional components of [minor's] autism disorder. Essentially, the distinct differences in the amount of environmental stimulation lead to a sensory overload[,] i.e., [minor's] spending the weekend playing with her siblings and having the excitement of being unfettered by the structure of her primary environment caused her to present as being much less controlled, both internally and externally, upon her return to care. [¶] . . . This is not to state that the parents did anything wrong during the visits, it merely points out the fact that [minor's] specific needs are better met by limiting her transitions and by not placing her in an over stimulating environment for extended periods of time."

Since the negative effects were noted, the social worker made the determination to change the frequency, location, duration, and activities involved in visitation. Visits since were scheduled outside the family home, at a park, or Chuck E. Cheese's. Thus, visitation occurred less frequently than before, taking place on January 28-29, February 2-4, and February 18-20. Minor had exhibited behavioral problems such as being tired, biting, spitting, acting out, and regressing upon return from visitation. On March 29,

14

2011, parents and siblings visited with minor at Chuck E. Cheese's: "At the end of the visit, [Minor] was a bit confused as to who she was going home with but made the transition without difficulty or lasting effect. Parents made arrangements to visit on May 5, 2011, but failed to show. Parents visited with minor at the park for three hours on May 20, 2011, with no subsequent deregulation in minor's behavior. On May 26, 2011, a visit occurred, to which mother brought a family member for additional support, so that mother could focus her attention on minor. On June 8 a visit occurred at minor's kindergarten graduation, and on June 27, 2011, parents visited with minor at Chuck E. Cheese's: "No issues or problems afterwards. Mother reports that [minor] seemed to be more engaging of her siblings during the visit in that she sought the siblings out independently and individually to play with them."

Parents longed for minor's return to their home and were evaluating what services, provided outside of the department, could help them achieve the standard of home maintenance they needed to attain. "The risk of detriment should [d]ependency be dismissed at this time is solely based upon the mental health issues of [father] and the ongoing struggles he has related to the traumatic brain injuries he sustained during his military service in Iraq. [Parents] have demonstrated their ability to engage the Veteran's Administration, as well as other service providers and to independently seek the necessary interventions as the need arises[;] however[,] [t]he undersigned, as a representative of [the department], wishes to recommend an additional period of family maintenance support as they solidify their current successes." Father's VA therapist "visits in the home weekly and reports that [father] is stable and is participating in the

15

recommended support groups. He has recently begun to participate in a weekly . . . group that will assist him in developing his outlets for socialization and support[] outside the home." The social worker noted minor's "need for a calm and stable environment is paramount to her mental and emotional stability."

In the status review report filed January 24, 2012, the social worker recommended termination of the dependency proceedings as to minor's siblings, but recommended setting the section 366.26 hearing to establish a permanent plan of legal guardianship for minor; based upon the fact that [minor's] special needs are such that returning her to the family home would likely create a situation that would lead to a deterioration in her overall progress as well as to overload the capacity of the parents to meet the ongoing needs of the other children in the home." "[I]t has become evident that the parents are truly at their capacity to provide for the needs of their children[] in the home and the special needs of [minor], are such that to return her to the family home are likely to cause a regression in her current progress and create a situation in the family home where all the children would likely be placed at risk." Minor "continues to require a great deal more individual attention than is practicable given the circumstances associated with [father's] ongoing psychological needs . . . ."

Parents maintained appropriate furnished housing, with adequate food and supplies for the children. Father "continues to be supported for his mental health needs through the VA. . . . He is provided with in-home therapeutic services as well as on-site services at the VA Hospital including medication monitoring, support groups[,] and dual diagnosis support for his alcoholism. [Father] openly admits that he occasionally

consumes alcohol contrary to the advice of his VA therapist . . . . There have been no reports that his consumption of alcohol has negatively impacted the family and/or the children's safety in the home. It is, however, of concern to this therapist and mental health provider due to the potential interactions alcohol can have with his medications." Father voluntarily had checked himself into the VA hospital twice during the last reporting period, the latest in December 2011, during which he spent two weeks hospitalized.

Parents had twice monthly unsupervised visits with minor. However, overnight, holiday and weekend visits were suspended as minor would "dysregulate" afterward. "Visits have taken place for day long excursions to theme based restaurants and parks as well as to the family home for birthday celebrations and holidays. . . . It is apparent that the parents do not consistently set the necessary limits for [minor] and they tend to respond to her wants and needs as opposed to ensuring that they set the limits and boundaries that keep her safe and regulated. This in turn leads [minor] to be less controllable in the foster home for periods of up to several days time upon her return . . . ." Minor "presents as being well adjusted to the placement home and she is well bonded to her caretakers and the other children in the foster home."

On January 27, 2012, the juvenile court dismissed the dependency as to minor's siblings and set the section 366.26 hearing as to minor. On February 14, 2012, the department changed minor's permanent plan to a PPLA (permanently planned living arrangement) without the goal of return to parents' home. Parents submitted, but mother objected to the change of goal.

17

In the status review report filed August 2, 2012, the social worker changed the recommendation to adoption as the permanent plan. "The undersigned has concerns about [minor] being in [PAPs'] care and family for three years without the benefit of permanency and assesses that now is the time to make a decision in favor of permanency on [minor's] behalf. [Minor] needs and deserves permanency after being a Court dependent for three years without the parents being any further down the road toward reunification than they were three years ago." "In light of the foster parents views on continuing the visitation and the connection to the biological family there does not appear to be any negative effects to [minor] which will result from the adoption."

The PAPs "want an open adoption to where [minor] continues to have a relationship with her biological sisters and her parents, although it is doubtful that [minor] knows what that relationship is. The parents have made every effort they know how to prepare and ready themselves for the return of [minor] to their home[;] however, it does not appear that they have the ability of taking on the additional load of one more child, especially given all [minor's] needs as an autistic child."[5] "The foster parents have assured the undersigned that they are not the kind of people who would withdraw the contact and visitation of the parents."

"The Court ordered visitation continues to be an appropriate arrangement. Two times a month for two[,] possibly three . . . hours a session at a public place, i.e.[,] a park, a fast food place with a playground, or Chuck E. Cheese have been successful venues."

_____

[5] Mother apparently gave birth to a fifth child in the interim before the instant report.

The social worker observed a visit at Chuck E. Cheese's on June 21, 2012, from 1:00 to 3:00 p.m. She observed minor did not interact with her parents or siblings much, but was focused on games, eating, and watching television. When it came time to leave, minor complained, but the social worker opined this was because she was having fun playing games and not because she would miss her family. Father did not appear to interact or communicate with minor.

The social worker noted that "[u]pon receiving this case on June 11, 2012[, she] has spent much time reviewing the history of this case, and statements made by all previous social workers regarding their recommendation for a permanent plan for [minor]. It has been the general consensus of the previous five social workers that there was not a substantial probability of [minor] returning home to her parents."[6] When informed of the social worker's new recommendation, mother cried and father, who appeared saddened, stated he could not cope with minor and her needs. "He is just now getting able to play with the children they have in their home and that it is too challenging for him to think about taking [minor] back into their home."

In the Section 366.26 report filed November 29, 2012, the social worker recommended termination of parental rights and adoption as minor's permanent plan. The social worker noted she had observed a three-hour visit between parents and minor at a park on October 9, 2012. She opined minor "does [not] appear to be attached or

---

[6] The department concedes in its respondent's brief that this is not true.

19

bonded with either parent."[7]  The social worker reported the PAPs love minor and were totally committed to her.

On January 29, 2013, the juvenile court held the section 366.26 hearing.  In preparation for qualifying minor to testify, minor identified herself, mother, father, and her sisters from family photographs.  Nonetheless, as a result of subsequent exchanges, the court disqualified minor as a witness.  As minor exited the courtroom, she said, "Bye, mommy" to mother.

Mother testified she had attended all but one of minor's Individualized Education Program (IEP) meetings, attended minor's kindergarten graduation, and had been attending a support group for mothers of autistic children. She had been visiting during the last reporting period every other week for two hours.[8]  Minor would sometimes run up to her and hug her at the beginning of visits.  When visits were over minor would ask to stay longer or stay the night.  When told she could not, she would ask, "'Why not?'"  Minor would tell mother she was mean because she would not allow minor to stay longer.  Minor calls mother "'Mom'" and father "'Dad.'"  She also calls her sisters both by their names and by the term "'sister.'"

---

[7]  As the department maintains in its brief, the sentence appears to contain a typographical omission of the word "not" between "does" and "appear" as the grammatical context of the sentence does not make sense otherwise.  Moreover, mother's counsel questioned her at the section 366.26 as to whether she understood "the social worker is saying that you don't have a bond with your daughter?"

[8]  Since the adoption recommendation, the social worker reduced visitation from four hours to two hours.

Mother felt she and minor had a bond, minor loved her, and she was part of their family. Minor sought "comfort from me when she is present at the visitations. She also seeks comfort from her sister and she consoles her sister . . . when she feels that someone is not felling at their best, she is very caring towards all of us." Mother could tell minor had a bond with her sisters by "[t]he way she interacts with them. She is very considerate when they are crying, when they are sad, when something bothers them. . . . She hugs them, she kisses them, she tells them she loves them. . . . She tells them that she will be back." Mother believed depriving minor of visitation with her biological family would be traumatic, "Because she knows we are her family. You just take that away from her and then how are you going to deal with that?"

The current social worker, Sarah Conrad, testified she had been assigned the instant case since June 2012, and had observed three visits between minor and parents. Minor "dysregulates" after visits with parents: "she reverts back to some old behaviors to where she is not as compliant and shows anxiety." Autistic children "need structure, they need limitations, they need one-on-one attention. They need to be feeling stable and secure and just a predictable environment." She opined parents could not meet those needs. Minor's best interest was in getting adopted, "because she needs to feel secure and stable. She needs that assurance that she really belongs in this home and that she is a part of the family more so than she is getting now with having two sets of mom[s] and dads and the confusion that that gives to her."

Conrad testified with regard to parents that minor "isn't aware of them being her parents, her family. She treats them as she does the children at school or the children in the playroom. She plays with her siblings as much as I saw her do with her classmates at school and with the children that were in the playroom today. She is a sociable child." On the other hand, she interacts differently with the PAPs; she treats them as her parents and has a bond with them.

"Adoption is the better alternative. But my heart went out to the mother when she felt that she would never see [minor] again and I spoke with the foster parents and they— in fact, they have still kept [in] contact with the two children who have been returned to [mother]. [The PAPs] have them over for visits, they are very loving, very connected people and they would not do anything to hurt someone. They would not withdraw visits." "I don't believe she won't see her parents anymore. If you've read the report, I've done extensive talking with the [PAPs] and they have assured me they will continue."

The juvenile court noted that parents had chosen to have two additional children since minor's dependency proceedings began. "You are nurturing parents, you are devoted to [minor], you are devoted to your other children, I don't think there is any question to that, but when you extended yourself so much, I think sometimes something falls apart and something has to break . . . ." "[T]he parents have maintained visitation with benefit to" minor. Nevertheless, the court found the benefits of permanency in adoption outweighed any benefit of maintaining the parent-child relationship. "I'm confident that once I conclude this hearing prior to adoption, that there will be an

22

agreement between the parties for visitation. I'm confident of that because of all of the love that I've seen in everyone today."

The court asked of the department, "I don't really think there is any dispute as to a sibling bond here, do you dispute?" The department did dispute it. The court noted that most of minor's siblings "were born after [minor] was removed from the home, so there has not been that bonding that occurs when all the children are living together."[9] Regardless, the court found any sibling bond was outweighed by the permanence of adoption. The court terminated parental rights and ordered adoption as the permanent plan.

## DISCUSSION

### A.    BENEFICIAL PARENTAL RELATIONSHIP EXCEPTION

Parents contend the juvenile court erred in declining to apply the beneficial parental relationship exception to termination of parental rights and should have ordered long term guardianship instead. We disagree.

Once reunification services have been terminated and a minor has been found adoptable, "adoption should be ordered unless exceptional circumstances exist." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 51.) Under section 366.26, subdivision (c)(1)(B)(i) one such exception exists where, "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." The parent has the burden of proving termination would be detrimental to the child. (*In re*

---

[9] Minor had four siblings; two were born before and two after the dependency proceedings were initiated as to minor.

23

*Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350 (*Jasmine D.*); *In re Jerome D.* (2000) 84 Cal.App.4th 1200, 1207.)

"'[T]he court balances the strength and quality of the natural parent[-]child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.' [Citation.]" (*In re C.F.* (2011) 193 Cal.App.4th 549, 555.)

"[I]t is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1350; see also *In re Casey D.*, *supra*, 70 Cal.App.4th at p. 51.) "We determine whether there is substantial evidence to support the trial court's ruling by reviewing the evidence most favorably to the prevailing party and indulging in all legitimate and reasonable inferences to uphold the court's ruling. [Citation.] If the court's ruling is supported by substantial evidence, the reviewing court must affirm the court's rejection of the exceptions to termination of parental rights . . . . [Citation.]" (*In re S.B.* (2008) 164 Cal.App.4th 289, 297-298.)

Here, substantial evidence supported the juvenile court's decision that the permanence afforded minor in her adoptive home outweighed any benefit that would be conferred upon her should she maintain her relationship with parents. Early on, father had been unable to cope with two-hour visitation, which, at that time, involved minor and only two siblings. Likewise, mother had then been found unready to cope with two

developmentally delayed children, father, and a toddler. Minor required "a calm and stable environment [as] paramount to her mental and emotional stability." Yet parents had difficulty setting limits on minor even during short visits. Thus, minor often regressed when returned to PAPs, expressing negative behavior including biting, spitting, and acting out. Yet parents now had two additional children to take care of. The social worker opined minor was not bonded with either parent. Thus, the juvenile court's decision to terminate parental rights was supported by sufficient evidence that it would not be detrimental to minor.

Parents exposit *In re Amber M.* (2002) 103 Cal.App.4th 681 and *In re Scott B.* (2010) 188 Cal.App.4th 452 (*Scott B.*) in support of their contention the parental beneficial relationship exception was applicable here. We find both decisions distinguishable. First, *Amber M.* affirmed a juvenile court order finding the exception applicable. Here, we must affirm the juvenile court's order finding the exception *inapplicable* unless there was insufficient evidence to support that decision. As discussed above, we find substantial evidence supported the juvenile court's order. Second, several professionals expressed conclusions that the mother and the minors in *Amber M.* were strongly bonded and that interfering with their relationships could be harmful to the minors. A psychologist who had conducted a bonding study between Amber and the mother found that they shared a "'primary attachment'" and "'primary maternal relationship'" that could be detrimental to sever. Amber's therapist believed she and the mother had a strong bond and that it was important their relationship continue. (*Amber M.*, at p. 689.) The court appointed special advocate (CASA) for one of the other minors

25

testified that minor "loved and missed Mother and had difficulty separating from her." (*Ibid*.) The CASA disagreed with the Agency's recommendation of adoption. (*Id*. at pp. 689-690.) Thus, unlike the instant case there was overwhelming evidence the mother and the minors had a strong relationship that would detrimental to minors to sever.

In *Scott B.*, *supra*, 188 Cal.App.4th 452, the minor was removed at nine years old and was 11 years old at the time of the hearing. Thus, he had spent almost his entire life with the mother. The CASA repeatedly stated the mother and the minor had a very close relationship which would be detrimental to be disrupted. The minor had repeatedly expressed his preference to live with the mother. (*Id*. at p. 471.) Here, minor was four when detained and had been living with the PAPs for more than three years. No CASA or other professional expressed an opinion that minor was bonded to parents such that adoption would be detrimental to her.

Parents additionally complain parental rights were improperly terminated simply due to minor's autism and parents' inability to care for her. (*In re Paul E.* (1995) 39 Cal.App.4th 996, 1004 [minor's autism not dispositive on decision to remove; agency must show no reasonable means of protecting minor without removal]; *Scott B.*, *supra*, 188 Cal.App.4th 452 [parents with autistic child who will likely never be able to reunify does not justify termination of parental rights where minor and parents enjoy strongly bonded relationship the severance of which would be detrimental to minor].) However, it is apparent from the record that parents' parental rights were not terminated simply because minor was autistic and parents were unable to care for her. Rather, the beneficial parental relationship exception to termination of parental rights did not apply because

substantial evidence supported a determination minor was not bonded with parents and that continued visitation with parents would be detrimental to the progress she had made.

Parents finally maintain the juvenile court's decision was, at least in part, improperly based on its determination the PAPs would maintain visitation between minor and parents. (*In re S.B.*, *supra*, 164 Cal.App.4th at p. 300 ["We do not believe a parent should be deprived of a legal relationship with his or her child on the basis of an unenforceable promise of future visitation by the child's prospective adoptive parents"]; *In re C.B.* (2010) 190 Cal.App.4th 102, 129-130 [same].) It is true the social worker made several references to the maintenance of postadoption visitation in support of her recommendation. The juvenile court also expressed confidence such visitation would be maintained postadoption, even going so far as to pass out paperwork to accomplish this. Nevertheless, it is apparent the juvenile court's basis for finding the exception inapplicable was that the benefit of permanency to be found in adoption outweighed any benefit in maintaining the parent-child relationship. Thus, the court did not act improperly in terminating parents' parental rights.

### B.    SIBLING RELATIONSHIP EXCEPTION

Parents argue the court erred in declining to apply the beneficial sibling relationship exception to the termination of their parental rights. Again, we disagree.

The sibling relationship exception applies if the court finds a compelling reason for determining that termination would be detrimental to the child due to a "substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with

27

a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (§ 366.26, subd. (c)(1)(B)(v).)

"Reflecting the Legislature's preference for adoption when possible, the 'sibling relationship exception contains strong language creating a heavy burden for the party opposing adoption. It only applies when the juvenile court determines that there is a "compelling reason" for concluding that the termination of parental rights would be "detrimental" to the child due to "substantial interference" with a sibling relationship.' [Citation.] Indeed, even if adoption would interfere with a strong sibling relationship, the court must nevertheless weigh the benefit to the child of continuing the sibling relationship against the benefit the child would receive by gaining a permanent home through adoption. [Citation.]" (*In re Celine R.* (2003) 31 Cal.4th 45, 61.) Parents have the burden of establishing the applicability of the exception. (See *In re Megan S.* (2002) 104 Cal.App.4th 247, 252.)

In reviewing challenges to a trial court's decision as to the applicability of these exceptions, we will employ the substantial evidence or abuse of discretion standards of review depending on the nature of the challenge. (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1315-1316.) We will apply the substantial evidence standard of review to evaluate the evidentiary showing with respect to factual issues, such as whether the child has a close and strong bond with a sibling (for the sibling relationship exception). (*Id*. at p. 1315; § 366.26, subd. (c)(1)(B)(i), (v).) However, a challenge to the trial court's

28

determination of questions such as whether, given the existence of a sibling relationship, there is a compelling reason for determining that termination of parental rights would be detrimental to the child "is a quintessentially discretionary determination." (*Scott B.*, *supra*, 188 Cal.App.4th at p. 469.) We review such decisions for abuse of discretion. In the dependency context, both standards call for a high degree of appellate court deference. (*Ibid.*; *Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1351.)

Here, although the court apparently found a sibling bond, it expressly ruled minor's need for permanence outweighed that bond. That determination was within the court's discretion. First, minor had only ever lived with two of her siblings at the time she was taken into protective custody; one for a little over three years and the other for a little over one year. She had never lived with either of her youngest siblings. At the time the juvenile court terminated parents' parental rights, three and a half years had elapsed since the department detained minor. Thus, minor had spent more time living away from even her oldest sibling than she had spent living with her.

Second, although the department initially placed minor with her siblings, it removed minor from that placement due, in part, to aggressive tendencies toward her sisters. When moved, minor's behavior improved dramatically Third, as discussed above, minor required "a calm and stable environment [as] paramount to her mental and emotional stability." Where minor's visitation with her siblings could be construed as a catalyst for regressive behavior, the court acted within its discretion in determining that the permanency and stability offered by adoption outweighed any benefit minor sustained from a continued relationship with her siblings.

29

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
J.

We concur:

McKINSTER
Acting P. J.

RICHLI
J.