Filed 2/17/15  In re D.W. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re D.W. et al., Persons Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E061069 |
| Plaintiff and Respondent, | (Super.Ct.No. RIJ120366) |
| v. | OPINION |
| A.W., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Jacqueline C. Jackson, Judge.  Affirmed.

Daniel G. Rooney, under appointment by the Court of Appeal, for Defendant and Appellant.

Gregory P. Priamos, County Counsel, and Anna M. Marchand, Deputy County Counsel, for Plaintiff and Respondent.

Defendant and appellant A.W. (Mother) is the mother of six-year-old D.W. and two-year-old J.W. The children were found to be dependent children of the juvenile court under Welfare and Institutions Code section 300.[1] Mother appeals the juvenile court's denial of her petition for modification of court order pursuant to section 388. She argues that the juvenile court erred when it failed to order a full evidentiary hearing on her request. Having carefully considered the arguments advanced by Mother, we reject Mother's claims and affirm the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

The family came to the attention of the Riverside County Department of Public Social Services (DPSS) on August 11, 2010, when an immediate response referral was received alleging general neglect/caretaker absence of then two-year-old D.W. Mother had a history of abusing drugs and had left the child with the maternal grandmother. The maternal grandmother and her live-in boyfriend were involved in a domestic violence incident, resulting in the maternal grandmother's arrest. The maternal grandmother was again arrested on September 15, 2010, for assault after she rammed her boyfriend's car.

---

[1] All future statutory references are to the Welfare and Institutions Code unless otherwise stated.

D.W.'s father's whereabouts were unknown and Mother was in custody.[2] D.W. was being cared for by the maternal grandmother's best friend at the time of the maternal grandmother's arrest. D.W. was taken into protective custody.

Mother had a history with child protective services. She also had a criminal history relating to her drug abuse, as well as past mental health issues. Mother had admitted to using methamphetamine on September 15 and 24, 2010.

On September 20, 2010, a petition was filed on behalf of D.W. pursuant to section 300, subdivisions (b) (failure to protect) and (g) (no provision for support).

At a detention hearing, the court found a prima facie case for juvenile court jurisdiction under section 300 and placed D.W. in the temporary custody of DPSS. The court ordered services and supervised visits to the parents.

Mother had been visiting D.W., and the visits appeared to be going well. Mother had also been referred to services and had several intake appointments scheduled for inpatient substance abuse programs.

At the jurisdictional/dispositional hearing on November 2, 2010, the juvenile court found the section 300, subdivision (b) allegations in the petition true, and the subdivision (g) allegations not true. D.W. was declared a dependent of the court, and Mother was provided with reunification services. Mother's case plan required Mother to participate in counseling, a parenting program, a substance abuse program, and random drug testing.

---

[2] D.W.'s father is not a party to this appeal.

On March 29, 2011, D.W. was placed with her great maternal aunt and her husband. D.W. was attached to her relative caregivers and had adjusted well to her new home. Mother had been incarcerated during the six-month reporting period but had been participating in parenting, substance abuse, and anger management programs while incarcerated. She had also been able to visit D.W. twice a week beginning on February 3, 2011. Mother was scheduled to be released on April 17, 2011. While incarcerated, Mother had completed a parenting program and a substance abuse program.

At the May 2, 2011 six-month review hearing, the court continued Mother's services for an additional six months.

Since Mother's release from custody, she had been transient and residing with various friends. She had also failed to maintain regular contact with DPSS and was evasive about her living situation; and despite the social worker's encouragements, she had failed to participate in counseling and drug testing. She had failed to demonstrate an ability to maintain stability and long term sobriety in an independent setting. Mother also advised the social worker that she planned on resuming her relationship with her boyfriend once he was released from prison. DPSS counseled Mother about her need to be around influences that would encourage her to remain clean and stable. On October 11, 2011, Mother was arrested on an outstanding warrant, and remained incarcerated until November 14, 2011.

Meanwhile, D.W. continued to reside with her relative caregivers and was thriving in the home. She appeared happy and well-adjusted in the home and was receiving

4

excellent care in a loving, stable, and nurturing home. She was "very attached" to her caregivers and looked to them for comfort. D.W.'s relative caregivers had shown a strong commitment in ensuring D.W.'s needs were met and had expressed a commitment in providing her with a stable and permanent home including adoption. Mother had sporadically visited D.W. and reported that she was pregnant with her second child. Mother did not visit D.W. at all in October 2011.

The contested 12-month review hearing was held on December 6, 2011. At that time, the court terminated Mother's services and set a section 366.26 hearing.

Sometime after the 12-month review hearing, Mother entered a residential drug treatment program in Orange County as ordered through the criminal court. Mother completed the program on March 7, 2012, and returned to Riverside County but failed to make contact with DPSS and D.W. Her whereabouts were unknown until she filed a section 388 petition to change court order on April 4, 2012. In her petition, Mother requested the section 366.26 hearing be vacated and that she be provided with an additional six months of services. In support, Mother attached documentation to support her claim that she had completed a substance abuse treatment program, an anger management program, and a GED training program. She also asserted that she had tested negative for controlled substances and was regularly attending Narcotics Anonymous (NA)/Alcoholics Anonymous (AA) meetings and that she had a sponsor. Mother further claimed that she had a strong bond with D.W.; that D.W. loved her; and that the visits were appropriate. DPSS objected to the change in court order because Mother had not

participated in counseling, was unemployed, appeared to be transient, and did not appear to manage sobriety absent a structured environment.

On August 22, 2012, the juvenile court granted Mother's section 388 petition as long as Mother obtained a suitable residence, was available to DPSS, and participated in her amended case plan. Mother's amended case plan required Mother to obtain suitable housing, randomly drug test, attend counseling, and participate in a parenting education program and a substance abuse treatment program.

Mother gave birth to her second child, J.W., in March 2012.[3] Mother had been providing DPSS with false addresses as to her residence and had been evading contact with DPSS. By September 2012, DPSS learned that Mother was residing with the maternal grandmother. On September 6, 2012, the social worker was informed that Mother and the maternal grandmother had both tested positive for methamphetamine. Mother admitted to relapsing and using methamphetamine on three to four different occasions before enrolling in a substance abuse treatment program. J.W. was taken into protective custody and placed with his half sibling D.W.

On September 12, 2012, DPSS filed a petition on behalf of the child pursuant to section 300, subdivisions (b) (failure to protect) and (j) (abuse of sibling). J.W. was formally detained on September 13, 2012. On October 10, 2012, the juvenile court found the allegations in the petition true and declared J.W. a dependent child of the court. Mother was provided with reunification services and was participating in her services.

---

[3] J.W.'s father is not a party to this appeal.

By February 25, 2013, Mother had been testing negative for controlled substances, regularly attending her therapy sessions, and making progress at addressing her issues. She had completed two parenting programs and had been attending an intensive outpatient substance abuse program. Mother also had maintained a suitable residence; however, DPSS was concerned with Mother residing with the maternal grandmother who continued to abuse controlled substances. Mother informed DPSS that her plan was to secure her own residence once she received funding to facilitate the move. Mother also regularly visited the children and was observed to be appropriate, loving, and nurturing in her interactions with the children. Her visits had progressed to unsupervised eight hour day visits two times a week, but DPSS had not authorized overnight visits due to the maternal grandmother continuing to reside in the home.

The combined 18-month review hearing as to D.W. and the six-month review hearing as to J.W. was held on February 25, 2013. At that time, the juvenile court placed the children in Mother's care on family maintenance status on the condition that the maternal grandmother not reside in the home.

DPSS continued to be concerned that the maternal grandmother was residing with Mother. In addition, Mother had tested positive for methamphetamine in April 2013 and admitted to relapsing. Following the relapse, on June 27, 2013, Mother and the children moved into a residential substance abuse treatment center. Mother, however, was discharged from the residential program on July 22, 2013, after she fought with another

7

resident. Mother then located another program and the children returned to their former relative caregivers.

On August 26, 2013, the juvenile court continued Mother's family maintenance services for an additional six months. At that time, the court also ordered Mother to participate in a psychological evaluation. However, on October 3, 2013, DPSS detained the children and filed a section 387 petition on October 7, 2013. The children were formally detained on October 8, 2013.

Mother had continued to abuse drugs and violated the terms of her probation. She had allowed a man who had an extensive criminal background and open dependency case to move in with her and care for the children at times. In addition, a probation search of the residence revealed marijuana, drug paraphernalia, including several syringes, and two baggies of crystal methamphetamine.[4] As a result, on October 3, 2013, Mother was arrested for associating with a known drug user.

The children were returned to their prior relative caregivers. D.W. reported that she had been a little afraid of Mother's friends and wanted to remain living with her relative caregivers. The caregivers again expressed their desire to provide a permanent and stable home for the children.

Mother was released from custody on November 5, 2013, and her probation was reinstated. Her whereabouts were unknown until November 18, 2013. Mother was

---

[4] Mother was placed on probation in San Bernardino County on December 14, 2010. Her probation was scheduled to expire on March 17, 2014.

8

resistant to return to counseling and believed DPSS was too restrictive about whom she associated with. On December 3, 2013, Mother reported that she had been sober for 164 days and was attending NA/AA meetings. She had also reentered the Family Preservation Court Program (Family Program) at the program's level Phase I.

The children continued to reside with their relative caregivers and had adjusted "extremely well." They had showed no signs of emotional distress, and, in fact, J.W. had appeared more relaxed and secure in his caregiver's care. When visits with Mother had resumed, J.W. had initially appeared apprehensive when he saw Mother and had difficulty going to her and preferred to stay near or be held by his caregiver. D.W. had desired to return to Mother as well as to stay with her caregivers, and she appeared concerned with Mother finding a home.

On December 17, 2013, the juvenile court found the allegations in the section 387 petition true and removed the children from Mother's custody and care. The court terminated Mother's family maintenance services and determined that Mother had exceeded the statutory time for further reunification services. The court set a section 366.26 hearing.

The prospective adoptive relative caregivers (caregivers) were interested in adopting the children and providing them with a stable, loving, and nurturing home. Both children were happy, well-adjusted, and thriving in their caregivers' home. D.W. was conflicted about being separated from her mother and had cried over a belief that her mother did not want her anymore. Nonetheless, D.W. was closely bonded to her

9

caregivers, their children, and her brother, and reported that she wanted to remain living in her caregivers' home. J.W. was strongly attached to both his sister and caregivers, and showed signs of separation anxiety when his caregivers were out of sight.

On April 15, 2014, Mother filed a section 388 petition with supporting documentation, alleging that she had changed her circumstances and that the change order was in the children's best interest. In support, Mother claimed that she had been participating in the Family Program and had been recently advanced to Phase III; that she had been testing negative for drugs; that she had obtained suitable housing for herself and the children; that she had an NA sponsor; and that she had completed a parenting program. She further asserted that she had maintained regular visitation with the children; that the children enjoyed the visits with her; that the visits were appropriate; and that she had a strong bond with the children and believed it was in the children's best interest to be reunited with her.

The juvenile court summarily denied the section 388 petition on April 16, 2014, checking the box stating "[t]he proposed change of order, recognition of sibling relationships, or termination of jurisdiction does not promote the best interest of the child[ren]." Mother filed a timely notice of appeal on April 29, 2014.

II

DISCUSSION

Mother asserts the juvenile court erred in summarily denying her section 388 petition without holding an evidentiary hearing because she met the prima facie burden justifying a hearing on the petition. We disagree.

Section 388, subdivision (a), permits anyone having an interest in a dependent child to petition the juvenile court for a hearing to change, modify or set aside a previous order on the ground of changed circumstances or new evidence. A parent seeking to change an order of the dependency court bears the burden of proving by a preponderance of the evidence that (1) there is a change in circumstances warranting a change in the order, and (2) the change would be in the best interest of the child. (*In re S.J.* (2008) 167 Cal.App.4th 953, 959 [Fourth Dist., Div. Two].)

The denial of a section 388 petition is reviewed for abuse of discretion. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 460-461.) The juvenile court's ruling will not be disturbed on appeal unless the trial court has exceeded the limits of discretion by making an arbitrary, capricious, or patently absurd determination, i.e., the decision exceeds the bounds of reason. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319 (*Stephanie M.*).) " ' "When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." [Citations.]' [Citations.]" (*In re Brittany K.* (2005) 127 Cal.App.4th 1497, 1505.) "It is

11

rare that the denial of a section 388 motion merits reversal as an abuse of discretion . . . ." (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 522 (*Kimberly F.*).)

The juvenile court shall order that a section 388 hearing be held if it appears that the child's best interest may be promoted by the proposed change of order. (§ 388, subd. (d).) The court may deny the section 388 petition ex parte—i.e., without a hearing—if the petition does not state a change of circumstance or new evidence that might require a change of order or fails to demonstrate that the requested modification would promote the child's best interest. (Cal. Rules of Court, rule 5.570(d).)

Section 388 petitions "are to be liberally construed in favor of granting a hearing to consider the [petitioner's] request. [Citations.] The [petitioner] need only make a prima facie showing to trigger the right to proceed by way of a full hearing. [Citation.]" (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309-310.) "There are two parts to the prima facie showing: The [petitioner] must demonstrate (1) a genuine change of circumstances or new evidence, *and* that (2) revoking the previous order would be in the best interests of the children. [Citation.]" (*In re Anthony W.* (2001) 87 Cal.App.4th 246, 250 (*Anthony W.*), italics added.) The prima facie showing may be based on the facts in the petition and in the court file. (*In re Angel B., supra,* 97 Cal.App.4th at p. 463.) "The prima facie requirement is not met unless the facts alleged, if supported by evidence given credit at the hearing, would sustain a favorable decision on the petition." (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806.)

12

General or conclusory allegations are not enough to make a prima facie showing under section 388. (*In re Edward H.* (1996) 43 Cal .App.4th 584, 593 (*Edward H.*).) The petition must include "specific allegations describing the evidence constituting the proffered changed circumstances or new evidence." (*Ibid.*) "Successful petitions have included declarations or other attachments which demonstrate the showing the petitioner will make at a hearing of the change in circumstances or new evidence." (*Anthony W.*, *supra*, 87 Cal.App.4th at p. 250.) Indeed, "[i]f a petitioner could get by with general, conclusory allegations, there would be no need for an initial determination by the juvenile court about whether an evidentiary hearing was warranted. In such circumstances, the decision to grant a hearing on a section 388 petition would be nothing more than a pointless formality." (*Edward H.*, at p. 593.) If the petition fails to make the required prima facie showing, summary denial of the petition without a hearing does not violate the petitioner's due process rights. (*In re Angel B., supra,* 97 Cal.App.4th at pp. 460-461.) Having reviewed the record as summarized above, we conclude the juvenile court properly exercised its discretion by summarily denying Mother's section 388 petition.

It appears the juvenile court here denied Mother's section 388 petition because Mother failed to establish that the proposed change would be in the children's best interest. The ruling is not an abuse of discretion. Parent and child share a fundamental interest in reuniting up to the point at which reunification efforts cease. (*In re R.H.* (2009) 170 Cal.App.4th 678, 697.) Mother's reunification services were terminated on

13

December 17, 2013.**5** By the point of a section 366.26 hearing to select and implement a child's permanent plan, however, the interests of the parent and the child have diverged. (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 254.) Therefore, after reunification efforts have terminated, the court's focus shifts from family reunification toward promoting the child's needs for permanency and stability. (*In re Marilyn H.*, *supra*, 5 Cal.4th at p. 309.) "[I]n fact, there is a rebuttable presumption that continued foster care is in the best interest of the child. [Citation.] A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, the best interest of the child." (*Stephanie M.*, *supra*, 7 Cal.4th at p. 317.)

Mother failed to make a prima facie showing that providing her with an additional six months of reunification services with the goal of returning the children to her care would serve the best interest of the children. The record clearly shows that the children were very bonded to their caregivers; and that they were happy, well-adjusted, and thriving in their caregivers' home. D.W. had been placed with the caregivers when she was initially removed from Mother's care when she was two years old on March 29, 2011, and again on October 3, 2013, after briefly returning to Mother's care on family maintenance services. Although D.W. was conflicted about being separated from her

---

**5** DPSS argues Mother's claim that she was eligible for further services pursuant to the statutory time limits afforded for reunification was waived. We need not determine this issue because we assume, for the sake of argument, Mother was eligible for additional services.

14

mother, D.W. was closely bonded to her caregivers, their children, and her brother, and reported that she wanted to remain living in her caregivers' home. J.W. was placed with the caregivers when he was around six months old and was strongly attached to both his sister and caregivers, and showed signs of separation anxiety when his caregivers were out of sight. The caregivers were committed to providing the children with a safe, loving, stable, and nurturing home.

By the time Mother filed her section 388 petition, D.W. had essentially been in a stable, prospective adoptive home for about three years and J.W. about seven months, were doing very well, and had bonded with the family. Mother's ability to successfully achieve unsupervised visitation and to then reunify with the child was extremely uncertain by comparison. Mother had a history of being repeatedly incapable of combating her substance abuse and stability issues, despite having had the benefit of several years of reunification services. Given that Mother's services had been terminated on December 17, 2013, the children's interest in the permanency and stability they had found outside Mother's care was paramount. Mother did not show that returning the children to her custody would benefit the children in any way. As previously noted, "After the termination of reunification services, . . . 'the focus shifts to the needs of the child for permanency and stability' [citation] . . . ." (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 317.) Those needs could best be met by letting the children be adopted by their caregivers.

It is not in the children's best interest for permanence to be delayed for an unknown or indefinite period of time, with no certainty or even likelihood Mother could progress to the point of obtaining custody of the children. Given that Mother had abused methamphetamine for many years and had a number of previous failed efforts at treatment, her recent sobriety failed to show that she could provide the children with stability and permanency or that the requested change was in the children's best interest. (See, e.g., *In re C.J.W.* (2007) 157 Cal.App.4th 1075, 1081 [parents' three-month rehabilitation efforts were insufficient in light of "extensive histories of drug use and years of failing to reunify with their children."]; *In re Mary G.* (2007) 151 Cal.App.4th 184, 205-206 [mother being clean for four months was insufficient in light of 23-year substance abuse history]; *In re Amber M.* (2002) 103 Cal.App.4th 681, 686 [mother being clean for 372 days was insufficient in light of her 17-year substance abuse history and two previous relapses]; *In re Casey D.* (1999) 70 Cal.App.4th 38, 48-49 [juvenile court did not abuse its discretion in finding no changed circumstances based on "the parents' extensive drug histories; pattern of maintaining drug treatment only when motivated by the desire to reunify the family and required by outside agencies; and Casey's young age[, which] meant that she was too young to be able to protect herself if the parents should relapse"].)

In sum, there is insufficient evidence that the delay in permanency planning would be in the children's best interest. As much as Mother was to be commended for her efforts to become an effective parent and resolve her drug addiction, the fact remained

16

that the children could not safely be maintained in Mother's care or that Mother could provide the children with stability and permanency. Under these circumstances, we cannot conclude the juvenile court abused its discretion in denying Mother's section 388 petition without a full evidentiary hearing.

## III

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
                                            P. J.

We concur:


McKINSTER
                    J.


MILLER
                    J.

17