[No. D039220. Fourth Dist., Div. One. Oct. 15, 2002.]

In re AMBER M. et al., Persons Coming Under the Juvenile Court Law.
SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,
Plaintiff and Respondent, v.
DEBORAH M., Defendant and Appellant.

## COUNSEL

Craig E. Arthur, under appointment by the Court of Appeal, for Defendant and Appellant.

John J. Sansone, County Counsel, Susan Strom, Chief Deputy County Counsel, and Patrice Plattner-Grainger, Deputy County Counsel, for Plaintiff and Respondent.

## OPINION

**O'ROURKE, J.**—Deborah M. (Mother) appeals the judgment terminating her parental rights over Amber, Samuel, and Destiny M. She contends the court abused its discretion by denying her modification petition (Welf. & Inst. Code, § 388)[1] and by terminating her parental rights without receiving information about Amber's and Samuel's wishes (§ 366.26, subd. (h)), deprived her of her constitutional right to call Amber as a witness, and erred by failing to find the children would benefit from a continued relationship with her (§ 366.26, subd. (c)(1)(A)). We agree with the last contention.

### BACKGROUND

In August 1999, when Amber, Samuel, and Destiny were almost five years old, two and one-half years old, and seven months old, the San Diego County Health and Human Services Agency (the Agency) filed dependency petitions because Mother left Destiny alone in a bathtub full of water, where she was found submerged and almost drowned. Amber and Samuel were detained in Polinsky Children's Center, and then with their maternal grandmother (Grandmother), and Destiny was detained in a foster home. Amber and Samuel were then placed with Grandmother and Destiny was placed in a foster home. By November 5, Destiny had also been placed with Grandmother.

Near the end of October 1999, Samuel started a 60-day trial visit with Mother. Around Thanksgiving weekend, Mother relapsed into drug use. She

---

[1] All statutory references are to the Welfare and Institutions Code.

moved into a residential treatment facility with Samuel where she had contact with Brett S., Amber's and Samuel's father, in violation of the terms of the 60-day visit. In January 2000, she left the facility, took Samuel to the home of her father (Grandfather), and left him there. Samuel was then placed with Grandfather.

Around October 2000, Mother relapsed again: she had one positive drug test. She reentered residential treatment, left after two months, then returned to the treatment program in January 2001. In August, she filed her section 388 petition, requesting the court vacate its April 12, 18-month review hearing order setting a section 366.26 hearing and place the children with her or, alternatively, that it provide her additional services under section 366.3. As changes of circumstances or new evidence, she alleged that she had obtained suitable housing, maintained 338 days of sobriety, graduated from domestic violence and drug treatment programs, completed a program for parents of sexually abused children,[2] and participated in therapy with Amber and Samuel.

The hearing on Mother's section 388 petition and the section 366.26 hearing took place from September through November 2001. Amber and Destiny remain with Grandmother, who wishes to adopt them, and Samuel remains with Grandfather, who wishes to adopt him.

## SECTION 388 PETITION

The juvenile court may modify an order if a parent shows, by a preponderance of the evidence, changed circumstance or new evidence and that modification would promote the child's best interests. (§ 388; *In re Michael B.* (1992) 8 Cal.App.4th 1698, 1703 [11 Cal.Rptr.2d 290].) This is determined by the seriousness of the problem leading to the dependency and the reason for its continuation; the strength of the parent-child and child-caretaker bonds and the time the child has been in the system; and the nature of the change of circumstance, the ease by which it could be achieved, and the reason it did not occur sooner. (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 530-532 [65 Cal.Rptr.2d 495].) After termination of services, the focus shifts from the parent's custodial interest to the child's need for permanency and stability. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317 [27 Cal.Rptr.2d 595, 867 P.2d 706].) "Whether a previously made order should be modified rests within the dependency court's discretion, and its determination will not be disturbed on appeal unless an abuse of discretion is clearly established." (*In re Michael B., supra,* 8 Cal.App.4th at p. 1704.) The denial of a section

---

[2] There were unsubstantiated allegations that Amber had been molested by Brett S. and by another boyfriend of Mother's, and that Samuel might have been sexually abused as well.

388 motion rarely merits reversal as an abuse of discretion. (*In re Kimberly F., supra,* 56 Cal.App.4th at p. 522.)

■ Here, in addition to nearly drowning Destiny, Mother abused drugs, engaged in a violent relationship with Brett S., and neglected the children.[3] Despite a one-year voluntary services contract beginning in September 1996, a second voluntary contract beginning just before the inception of this case, and a reunification period extending over more than 18 months, Mother's serious parenting deficiencies had not been fully remedied by the time of the section 388 hearing. For example, her lack of empathy for the children was evident in her testimony that while Amber and Destiny had lived with Grandmother for two years and were bonded with her, removing them suddenly from Grandmother's home would not be detrimental or cause any emotional harm.[4] Moreover, although Mother had sought information and advice from Samuel's therapist, Mother did not understand Samuel's psychological difficulties and during a conjoint session had resisted Samuel's attempts to interact with her.

While by the time of the section 388 hearing Mother had completed domestic violence and sexual abuse treatment and the residential portion of her substance abuse program, for most of the dependency her visitation with the children remained supervised. Her substance abuse had begun more than 17 years earlier and while she had been clean for 372 days, she had previously relapsed twice during the course of this case, once after more than 300 days of sobriety. Furthermore, the coordinator of Mother's drug treatment program testified that Mother was in the early stages of recovery and Mother's sponsor testified that Mother was only on step three of her 12-step program.

The children had been out of Mother's care for more than two years, with the exception of Samuel's approximately two-month trial visit. Although the children enjoyed visits and Amber and Samuel loved and missed Mother and called her "mom," the children were attached to Grandmother and Grandfather. The social worker believed that returning the children to Mother would "greatly jeopardize their safety, stability, progress, and consistency" and that while Mother loved the children and had progressed, she would not be able to maintain her recovery activities and be the primary caretaker for her three active children. The court appointed special advocate (CASA) also recommended against the children's return to Mother, noting that she was not ready to handle them on her own. Finally, at the time of the hearing, Mother

---

[3]There were also prior reports of physical and emotional abuse.

[4]Six days later, however, Mother testified that a gradual transition to her care would be best.

was living in a sober living housing unit that would not accommodate the children, and the waiting time for a unit that would accommodate them was up to 90 days.

The above facts lead us to conclude that the juvenile court did not abuse its discretion by determining that while Mother was progressing in treatment, return to her custody would not be in the children's best interests. Nor did the court err by concluding that section 366.3's provision regarding services applies only after the selection of a permanent plan.

### AMBER'S AND SAMUEL'S WISHES

Section 366.26, subdivision (h) provides that at the section 366.26 hearing, "the court shall consider the wishes of the child." Additionally, section 366.21, subdivision (i)(5) states: "Whenever a court orders that a hearing pursuant to Section 366.26 shall be held, it shall direct the [Agency] to prepare an assessment that shall include: [¶] . . . [¶] . . . a statement from the child concerning placement and the adoption or guardianship, unless the child's age or physical, emotional, or other condition precludes his or her meaningful response, and if so, a description of the condition." ▮ While there is some disagreement whether evidence of the child's wishes must reflect his or her awareness that termination of parental rights is at issue (compare *In re Diana G.* (1992) 10 Cal.App.4th 1468, 1480 [13 Cal.Rptr.2d 645] with *In re Leo M.* (1993) 19 Cal.App.4th 1583, 1592-1593 [24 Cal.Rptr.2d 253]), it is clear that a direct statement from the child is not required where this is contrary to the child's best interest (*Leo M.,* at p. 1592).

Here, both Amber and Samuel expressed conflicting wishes about staying with Grandmother and Grandfather or living with Mother. The social worker testified that she did not ask Amber or Samuel what permanent plan they would like because of Samuel's age and both children's intense therapeutic needs, and that such a discussion should take place in therapy sessions and should be postponed so as to avoid more trauma and confusion. The social worker believed that Amber and Samuel would be emotionally unable to understand the permanency issue. Both children's therapists had told the social worker that before discussing a permanent plan with the children, they needed a decision from the court on that matter. Samuel's therapist testified that he had told her that he was "not done living with [Grandfather]," which meant that he was not ready to move. Amber's therapist testified that Amber did not have the capacity to express an opinion about adoption.

The court did not abuse its discretion with regard to receiving information about Amber's and Samuel's wishes.

## Amber's Testimony

■ On September 21, 2001, the second day of the eight-day section 388 hearing, Mother's counsel asked that Amber be made available to testify, asserting that she had just received information that she was "still developing" and might result in an offer of proof. Counsel for the Agency objected, noting that Amber was not on the witness list and had not attended the Kids in Court program. Amber's counsel also objected, stating that if the court granted the request she would need time to investigate the possibility of making Amber unavailable as a witness. The court denied Mother's request, citing its untimeliness. The section 388 hearing concluded on October 22.

On November 7, 2001, at the end of the first day of the two-day section 366.26 hearing, Mother asked that Amber be made available to testify. The Agency's counsel again noted that Amber was not on the witness list and said that a statement from her therapist regarding detriment would be in order. Mother's counsel made an offer of proof that Amber would testify that she did not want Mother's parental rights terminated and that they had a strong relationship. Amber's counsel cited the testimony of Amber's therapist that Amber lacked the capacity to express an opinion about adoption and stated that counsel would have to speak with the therapist and that Amber would have to attend Kids in Court. The court denied Mother's request as untimely and possibly detrimental to Amber's mental health. The section 366.26 hearing concluded on November 26.

There was a time span of approximately four weeks between Mother's request at the section 388 hearing and the conclusion of that hearing, and a time span of approximately three weeks between her request at the section 366.26 hearing and the conclusion of that hearing. Thus, arguably there would have been sufficient time for any necessary investigation and for Amber to attend Kids in Court before she would have testified. Mother is incorrect, however, in asserting that there was no evidence that it would be detrimental for Amber to testify. According to the social worker, Amber's therapist stated that it would be detrimental to discuss permanency with Amber until the court had ordered a permanent plan. Moreover, there was ample testimony about Amber's relationship with Mother; Amber expressed conflicting wishes about staying with Grandmother and living with Mother; and Amber's therapist testified that Amber did not have the capacity to express an opinion about adoption.

The court did not deprive Mother of her constitutional right by denying her request to call Amber as a witness.

## Beneficial Relationship

Section 366.26, subdivision (c)(1) allows termination of parental rights upon clear and convincing evidence of adoptability. An exception exists if "[t]he parents . . . have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(A).) A beneficial relationship is one that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 [32 Cal.Rptr.2d 535].) The existence of this relationship is determined by "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs." (*Id.* at p. 576.)

Examining the evidence in the light most favorable to the judgment, we conclude that not only did Mother maintain regular visitation and contact, but she also met her burden of showing a beneficial relationship. (*In re Autumn H., supra,* 27 Cal.App.4th at pp. 576-577; *In re Cristella C.* (1992) 6 Cal.App.4th 1363, 1373 [8 Cal.Rptr.2d 342].) At the time the section 366.26 hearing ended, Amber, Samuel, and Destiny were seven, nearly five, and nearly three years old and had been out of Mother's custody for slightly more than two years. Amber had been in Mother's care for most of her life, Samuel had been in her care for more than half of his life, and Destiny had been in her care for the first seven months of her life.

A psychologist who conducted a two-hour bonding study of Mother and Amber concluded that they shared "a primary attachment" and a "primary maternal relationship" and that "[i]t could be detrimental" to sever that relationship. The psychologist admitted that the detriment could be mitigated if Amber were in a caring situation, such as with extended family; that Amber looked to Grandmother to fulfill her emotional and physical needs; the existence of an attachment did not mean that it was good for a child to be with a parent; and he had not reviewed Mother's psychological evaluation or spoken with Amber's or Mother's therapists or met Grandmother. Amber's therapist believed that Amber and Mother had a strong bond and it was important that their relationship continue. The therapist acknowledged that she lacked specific information about Mother's psychological diagnosis (information that would be important in assessing the mother-daughter relationship) and that Grandmother had provided Amber with a positive environment that had allowed Amber to make a lot of progress.

The CASA testified that Samuel loved and missed Mother and had difficulty separating from her. The CASA disagreed with the Agency's

recommendation of adoption due to the bond and love between Mother and the children but believed that the children should remain with Grandmother and Grandfather and that Mother was not ready to care for all three children on her own. The CASA noted that Samuel's behavior had improved when Mother's visits decreased. Samuel's therapist testified Samuel's relationship with Mother was positive and very important to him but that he was very attached to Grandfather and their relationship was very strong and positive. The therapist did not recommend that Samuel be removed from Grandfather's home.

Although the children were attached to Grandmother and Grandfather, the children enjoyed visits and Amber and Samuel loved and missed Mother and called her "mom." According to the social worker, while Mother loved the children and had progressed, she would not be able to maintain her recovery activities and be the primary caretaker of these three active children and returning the children to Mother would "greatly jeopardize their safety, stability, progress, and consistency." The social worker, who had observed about 15 visits, noted that at times caring for the children during visitation brought Mother to the point of exhaustion. The social worker concluded that while Mother had "made choices in her life that created barriers to the development of a beneficial parent/child relationship[,] the children have become dependent on the daily, on-going bond and attachment that they have with their grandparents."

The common theme running through the evidence from the bonding study psychologist, the therapists, and the CASA is a beneficial parental relationship that clearly outweighs the benefit of adoption. There is no challenge to the fact that Amber and Samuel love and miss Mother and have a strong primary bond with her. Even Destiny, while seemingly too young to have developed much of a relationship with Mother, nevertheless was very strongly attached to her. Mother visited as often as she was allowed and acted in a loving, parental role with the children when permitted visitation. She was devoted to them and did virtually all that was asked of her to regain custody. The social worker, the only dissenting voice among the experts, provided no more than a perfunctory evaluation of Mother's relationship to the children, instead focusing on her current inability to provide a home for them and on the suitability of the current placements, perhaps swayed by both grandparents' qualifications and willingness to adopt and their refusal to consider guardianship or any other permanent plan. Admittedly, at the time of the section 366.26 hearing, Mother was not ready for the children's return to her custody. Neither that fact, however, nor the suitability of the grandparents' homes can justify the termination of parental rights. If the proposed adoptions proceed, the three children will be adopted in two

separate groups, and the maintenance of mother-child and sibling relationships will depend solely on both grandparents' continued goodwill.

Unfortunately, this case was heard in 10 different sessions over a period of months. The juvenile court heard the section 388 matter first, but allowed some overlap in the evidence. On the final hearing date, the court addressed the section 366.26, subdivision (c)(1)(A) exception in no more than a cursory manner and did not look at the long-term effect on the children of terminating Mother's parental rights. Perhaps after the fragmented hearing process the court lacked a clear concept whether or not the exception had been proved. If it had such a concept, this is not evident from the record.

The juvenile court erred by declining to apply the section 366.26, subdivision (c)(1)(A) exception. We therefore reverse the judgment terminating parental rights and remand for a new section 366.26 hearing that shall include a finding whether the exception has been demonstrated. Notwithstanding the juvenile court's busy calendar, that hearing should be conducted in a timely and efficacious fashion.

### DISPOSITION

The judgment terminating parental rights is reversed and the matter is remanded for a new section 366.26 hearing. In all other respects, the judgment is affirmed.

Huffman, Acting P. J., and Haller, J., concurred.