# IN THE SUPREME COURT OF CALIFORNIA

In re CADEN C., a Person Coming Under the Juvenile Court Law.

---

SAN FRANCISCO HUMAN SERVICES AGENCY,
Plaintiff and Appellant,

v.

CHRISTINE C. et al.,
Defendants and Respondents;

CADEN C., a Minor, etc.,
Appellant.

S255839

First Appellate District, Division One
A153925, A154042

San Francisco City and County Superior Court
JD15-3034

---

May 27, 2021

Justice Cuéllar authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Corrigan, Liu, Kruger, Groban, and Jenkins concurred.

---

In re CADEN C.

S255839


Opinion of the Court by Cuéllar, J.


All too often, children experience harm — and shoulder long-term consequences — because their physical and emotional needs are neglected by their parents. In California, we rely on social services and statutory procedures to strike a delicate balance between protecting children from abuse or neglect and ensuring the continuity of children's emotionally important relationships, especially with their parents. The resulting balance sometimes gives a struggling parent enough time and support to overcome deficiencies and regain custody. When such success is not achieved, the dependency statutes require the court to hold a hearing under Welfare and Institutions Code section 366.26.[1] At that hearing, the court determines whether to terminate parental rights, making way for adoption, or to maintain parental rights and select another permanent plan.

When making that fraught determination, a court must sift through often complicated facts to weigh competing benefits and dangers for the child. It must consider practical realities over which it has limited control and envision a child's future under contingent conditions. And it must navigate situations that can change as quickly as the children before the court do.

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise noted.

1

To ease the court's difficult task in making this important decision, the statute provides a carefully calibrated process. Even if a court finds by clear and convincing evidence that the child is likely to be adopted, the parent may avoid termination of parental rights by establishing at least one of a series of enumerated exceptions. If the parent establishes that an exception applies, the statute sets out additional steps for selecting a permanent plan for the child that preserves parental rights. Going step by step through the prescribed process, the court can somewhat more easily accomplish the statutory goals of protecting the parent and child from an overhasty termination of their relationship while ensuring that the child is expeditiously placed in a safe and stable home.

In this case, the trial court found that the parent had established the first of the listed exceptions, the parental-benefit exception.[2] This exception applies where the parent has maintained regular visitation and contact with the child, the child would benefit from continuing the relationship, and termination of that relationship would impose a detriment on the child. The Court of Appeal reversed. It held that because the parent continued to struggle with substance abuse and mental health issues and because of the risks of foster care and benefits of the potential adoptive home, no reasonable court could find the child's relationship with his parent outweighed the benefits of adoption.

---

[2] We use the phrases "parental-benefit exception," "beneficial parental relationship exception," and "beneficial relationship exception" as labels for the exception currently codified at section 366.26, subdivision (c)(1)(B)(i). The labels are merely for ease of reference and do not reflect any substantive determination about the requirements to prove the exception.

The Court of Appeal did not explain how the parent's struggles related to the specific elements of the statutory exception: the importance of the child's relationship with the parent or the detriment of losing that relationship. Instead, the appellate court treated the lack of progress in addressing substance abuse and mental health issues as a categorical bar to establishing the exception. That conclusion was mistaken, so we now reverse.

**I.**

Caden C. was born in 2009 and lived with his mother (Mother) until he was four years old. In September 2013, the Marin County Health and Human Services Department removed Caden from Mother's custody because Caden and his mother had been living in a car and Mother admitted to recent drug use and suicidal ideation. The court subsequently took and then decided to retain jurisdiction of Caden. It ordered that he remain in foster care and that Mother address her substance abuse and mental health issues and attend parenting classes. Caden was placed in foster care with a nonrelative extended family member, Ms. H. At a review hearing in July 2014, the court adopted the Department's recommendation to retain jurisdiction but place Caden with Mother; Mother and Caden subsequently moved to San Francisco.

By June 2016, Mother had relapsed. The San Francisco Human Services Agency (the Agency) then filed a supplemental dependency petition and removed Caden from her custody. (See § 387.) The petition alleged that Mother had created an unhealthy relationship with Caden, exposing him to "conversations that cause fear and create behaviors that jeopardize his safety, emotional well-being, and education." The

Agency placed Caden back with Ms. H., but over the next year he moved through three other foster placements before being returned to Ms. H. The foster parents said they were exhausted by the multitude of services for Caden and expressed concern that visitation with Mother made it difficult for him to settle into their homes. During the same period of time, Mother reentered residential treatment and filed a modification petition to regain custody; the court denied the petition, and Mother disengaged from drug treatment. In May 2017, the court reduced Mother's visits to once per month, limited her educational rights, and set a hearing pursuant to section 366.26. Mother appealed, filed additional modification petitions and appealed their denials, and sought extraordinary relief.

The juvenile court eventually held a section 366.26 hearing from January to February 2018. Over four days the court heard testimony from numerous witnesses for both Mother and the Agency. It also received reports from the Agency; a bonding study from Mother's expert, Dr. Molesworth; a clinical consultation report from the Agency's expert, Dr. Lieberman; and a letter from Caden. Caden indicated that he did not want to come to the hearing. In light of his wishes and to avoid further traumatizing him, the court relied on his letter and statements in the course of the bonding study to understand his feelings. (See § 366.26, subd. (h)(1).)

The Agency argued that Caden was likely to be adopted, that Mother's parental rights should be terminated, and the court should order a permanent plan of adoption. The social worker indicated Mother sometimes discussed the case and her drug treatment in front of Caden, and described reports from caregivers and service providers that Caden talked about alcohol and drug use in detail. She testified that Caden was

doing well in his current foster placement with Ms. H., had not been harmed by having fewer visits with Mother, and would be able to form a bond with Ms. H. that would mitigate the loss of his relationship with Mother. And the social worker testified that Caden reacted positively to living with Ms. H. but grew distressed at the prospect of not living with his mother. Dr. Lieberman participated in administrative reviews of Caden's case starting in 2016. Dr. Lieberman testified for the Agency as an expert in parent-child bonding and attachment, with a specific focus in childhood trauma and its impact on children. She agreed that Caden "has a very strong emotional bond with his mother" but emphasized that "the narrowness of the bond poses a risk to [Caden's] ability to devote his attention, energy, investment to developmentally appropriate tasks now of learning [and] socialization." Dr. Lieberman also explained her opinion that Caden would need ongoing support to address the trauma from his early years as well as from separating from his mother, but that Ms. H. could provide him the necessary comfort and security such that termination of his relationship with Mother would not be harmful for him.

What Mother argued is that the court should not terminate her parental rights, because terminating her relationship with Caden would harm him. Numerous witnesses described how they'd observed the relationship. Mother herself testified that "I don't want my son to ever, ever blame himself and think that he did something wrong or feel abandoned because I grew up, I grew up abandoned and feeling those things and I saw to it that my child has known he was loved and that he was a good kid and he had a heart of gold and that his heart resembled god. Like why would you want to take that from him? Because that's exactly what it would do if you were to, if you

were to take me out of his life." On cross-examination of Mother, the Agency elicited testimony about Mother's ongoing methamphetamine addiction. Dr. Molesworth testified for Mother as an expert in child psychology, bonding studies, and the parent-child attachment. Based on his review of visit reports and visits he observed, Dr. Molesworth characterized Mother's interactions with Caden as generally positive. He explained that Caden had an intense bond with Mother of the kind that might tend to impede Caden in forming relationships with others but did not seem to have done so in his case. Dr. Molesworth suggested that, given the intense bond, losing contact with Mother would compound Caden's other traumas leading to significant emotional fluctuation, confusion, and acting out in the near term and in adolescence. On cross-examination, Dr. Molesworth opined that despite the descriptions of Caden's relationship with Ms. H., terminating contact with Mother would have detrimental effects of the kind he had described.

The court found that Caden was likely to be adopted but that Mother had established the parental-benefit exception, precluding termination of parental rights. The court explained Mother "has been a constant and that is the relationship that the Court does need to focus on." She "has maintained consistent and regular visitation and contact"; she "does stand in a parental role to her son"; and "the visits themselves have continued the significant emotional attachment that Caden and his Mother did create prior to his removals." Mother "substantially complied with her case plan and although unsuccessful at times . . . has continued her efforts to maintain her sobriety and address her mental health issues." As the court summed up its reasoning: "Caden loves his Mother. And he

does derive benefits from his visits with her. The record does show that while he has a strong developing relationship with Ms. H[.] that relationship in and of itself does not negate the harm that Caden would experience from the loss of his most significant emotional relationship." The court noted that "Dr. Lieberman did not interview or meet Caden" and emphasized that its review of both expert reports confirmed that "[Mother] and Caden have a consistent and positive relationship." On that basis, the court found that "severing Caden's relationship with his Mother would deprive Caden of a positive emotional attachment and greatly harm Caden." It therefore declined to terminate parental rights and ordered the Agency to determine if Ms. H. would agree to serve as a legal guardian.

In an addendum report, the Agency explained that Ms. H. did not feel comfortable with legal guardianship. She had concerns about Mother's demands for visitation and use of court process to disturb the placement. She expressed fear for her own safety and that of her family based on Mother's erratic behavior over the course of July 2014 to August 2016. Ms. H. instead expressed a preference to further consider legal guardianship but keep Caden in her care for the time being as a foster placement. The court then ordered that Caden remain in foster care subject to periodic review, and the Agency appealed the decision.

The Court of Appeal reversed the trial court — but its rationale encompassed a conclusion we now find to be mistaken. (See *In re Caden C.* (2019) 34 Cal.App.5th 87, 116 (*Caden C.*).) The Court of Appeal took particular issue with the trial court's suggestion that Mother had " 'substantially complied with her case plan' and 'continues her efforts to maintain her sobriety and address her mental health issues.' " (*Id.* at p. 110.) In so

doing, it followed a recent trend in the Courts of Appeal to place great emphasis on a parent's failure to make progress in addressing the problems that led to the child's dependency. (See *In re Breanna S.* (2017) 8 Cal.App.5th 636, 648; *In re Noah G.* (2016) 247 Cal.App.4th 1292, 1302, 1304; *In re Marcelo B.* (2012) 209 Cal.App.4th 635, 643–645.) The Court of Appeal also reasoned that the trial court "gave short shrift to uncontroverted evidence that long-term foster care posed substantial risk of further destabilizing a vulnerable child, fostered unhealthy and sometimes 'toxic' interactions between mother and child, and robbed Caden of a stable and permanent home with an exceptional caregiver." (*Caden C.*, *supra*, 34 Cal.App.5th at p. 110.)

We granted review to clarify the applicability of the parental-benefit exception — in particular, whether a parent must show progress in addressing issues such as drug abuse that led to the child's dependency in order to establish the exception — and to resolve the standard of review for decisions regarding the parental-benefit exception.[3]

---

[3] Around the time we heard oral argument in this matter, the trial court held a new section 366.26 hearing and terminated Mother's parental rights. Even though that decision renders this case moot, we have discretion to retain the case and decide it as one presenting issues of public importance, capable of repetition, yet tending to evade review. (See, e.g., *Conservatorship of Wendland* (2001) 26 Cal.4th 519, 524, fn. 1; *In re Kieshia E.* (1993) 6 Cal.4th 68, 74, fn. 5.) The parental-benefit exception is of great importance and one of the most litigated issues in dependency proceedings. Moreover, dependency matters should proceed as expeditiously as possible, which may heighten the difficulty of providing review in our

## II.

Even when a court proceeds to select a permanent placement for a child who cannot be returned to a parent's care, the parent may avoid termination of parental rights in certain circumstances defined by statute. One of these is the parental-benefit exception. What it requires a parent to establish, by a preponderance of the evidence, is that the parent has regularly visited with the child, that the child would benefit from continuing the relationship, and that terminating the relationship would be detrimental to the child. (See Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i); Evid. Code, § 115.) The language of this exception, along with its history and place in the larger dependency scheme, show that the exception applies in situations where a child cannot be in a parent's custody but where severing the child's relationship with the parent, even when balanced against the benefits of a new adoptive home, would be harmful for the child. While application of the beneficial parental relationship exception rests on a variety of factual determinations properly reviewed for substantial evidence, the ultimate decision that termination would be harmful is subject to review for abuse of discretion.

### A.

If the court cannot safely return a dependent child to a parent's custody within statutory time limits, the court must set

---

court. (See *Conservatorship of Susan T.* (1994) 8 Cal.4th 1005, 1011, fn. 5.) We therefore retain and decide the issues in this case.

a hearing under section 366.26. (See *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 248–249 (*Cynthia D.*).)

At the section 366.26 hearing, the question before the court is decidedly not whether the parent may resume custody of the child. (See *In re Amber M.* (2002) 103 Cal.App.4th 681, 690 (*Amber M.*); cf. § 388, subd. (a)(1) [parent must show changed circumstances to get back custody of child during dependency proceedings].) In fact, it is not permissible to order reunification at the section 366.26 hearing. (See *In re Zeth S.* (2003) 31 Cal.4th 396, 411 (*Zeth S.*); *In re Marilyn H.* (1993) 5 Cal.4th 295, 304–306 (*Marilyn H.*).) Indeed, when the court orders the section 366.26 hearing, reunification services have been terminated, and the assumption is that the problems that led to the court taking jurisdiction have not been resolved. (See, e.g., *In re Edward R.* (1993) 12 Cal.App.4th 116, 126.)

Instead, the goal at the section 366.26 hearing is "specifically . . . to select and implement a permanent plan for the child." (*Marilyn H.*, *supra*, 5 Cal.4th at p. 304; see also *Cynthia D.*, *supra*, 5 Cal.4th at p. 250 [" 'This hearing determines only the type of permanent home' "].) To guide the court in selecting the most suitable permanent arrangement, the statute lists plans in order of preference and provides a detailed procedure for choosing among them. (See § 366.26, subd. (b) ["In choosing among the alternatives in this subdivision, the court shall proceed pursuant to subdivision (c)"].) According to that procedure, the court must first determine by clear and convincing evidence whether the child is likely to be adopted. (See § 366.26, subd. (c)(1).) If so, and if the court finds that there has been a previous determination that reunification services be terminated, then the court shall terminate parental rights to allow for adoption. (See *Cynthia*

*D.*, *supra*, 5 Cal.4th at pp. 249–250.) But if the parent shows that termination would be detrimental to the child for at least one specifically enumerated reason, the court should decline to terminate parental rights and select another permanent plan. (See § 366.26, subd. (c)(1)(B)(i)–(vi), (4)(A).) As we have previously explained, "[t]he statutory exceptions merely permit the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption." (*In re Celine R.* (2003) 31 Cal.4th 45, 53, italics omitted (*Celine R.*).)

In interpreting the exceptions, we are guided by the relevant statutory provisions, read in context. (See, e.g., *Ryan v. Rosenfeld* (2017) 3 Cal.5th 124, 128.) In particular, we take account of the connection the statute establishes — when an exception applies — between the "best interest" of the child and the continuation of parental rights. Parallel to the provision detailing the exceptions (§ 366.26, subd. (c)(1)(B)(i)–(vi)), the statute provides that "[i]f the court finds that adoption of the child or termination of parental rights is not in the best interest of the child, *because* one of [those exceptions] . . . applies, the court shall" follow a process to select among permanent plans other than adoption. (§ 366.26, subd. (c)(4)(A), italics added.) In other words, when a parent establishes that one of the exceptions applies, adoption or termination is not "in the best interest of the child." (*Ibid.*; see Stats. 1997, ch. 510, § 1; Sen. Judiciary Com., Analysis of Assem. Bill No. 329 (1997–1998 Reg. Sess.) as amended June 23, 1997, pars. 14–15 ["This section provides that termination would be detrimental to the child and should not occur when one of the following circumstances exists. [¶] . . . [¶] [T]he proposed language would provide that termination would not be in the interests of the child when one of the four exceptions applies . . ."].)

The exception at issue in this case is limited in scope. It applies where "[t]he court finds a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances: [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) From the statute, we readily discern three elements the parent must prove to establish the exception: (1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child. In understanding these elements, we are guided by what has become the seminal decision interpreting the exception, the Fourth District Court of Appeal's opinion in *In re Autumn H.* (1994) 27 Cal.App.4th 567 (*Autumn H.*). The court there articulated the meaning of the exception in an opinion that has guided the thousands of Court of Appeal decisions on the exception since. (See *id.* at pp. 575–576; see also, e.g., Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2020) § 2.171[5][b][ii][A]–[B].) What the appellate court emphasized in *Autumn H.* is a crucial aspect of the trial court's responsibility in these cases: in assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home. (See *Autumn H.*, *supra*, at p. 575.) By making this decision, the trial court determines whether terminating parental rights serves the child's best interests.

The first element — regular visitation and contact — is straightforward. The question is just whether "parents visit consistently," taking into account "the extent permitted by court

orders." (*In re I.R.* (2014) 226 Cal.App.4th 201, 212.) Visits and contact "continue[] or develop[] a significant, positive, emotional attachment from child to parent." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) Courts should consider in that light whether parents "maintained regular visitation and contact with the child" (§ 366.26, subd. (c)(1)(B)(i)) but certainly not to punish parents or reward them for good behavior in visiting or maintaining contact — here as throughout, the focus is on the best interests of the child. (See *Cynthia D.*, *supra*, 5 Cal.4th at p. 254.)

As to the second element, courts assess whether "the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) Again here, the focus is the child. And the relationship may be shaped by a slew of factors, such as "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.) As the trial court and Court of Appeal did here, courts often consider how children feel about, interact with, look to, or talk about their parents. (See, e.g., *Caden C.*, *supra*, 34 Cal.App.5th at p. 109 ["The record is replete with comments from various care providers attesting to the significance of the bond between mother and son"]; *In re Scott B.* (2010) 188 Cal.App.4th 452, 466–467, 471 (*Scott B.*); *In re Brandon C.* (1999) 71 Cal.App.4th 1530, 1536–1537 (*Brandon C.*).) Doing so properly focuses the inquiry on the child, even as courts must remain mindful that rarely do "[p]arent-child relationships" conform to an entirely consistent pattern. (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350 (*Jasmine D.*); see also *In re Grace P.* (2017) 8 Cal.App.5th 605, 614–615 ["parenting styles and relationships differ greatly between

families"]; *In re S.B.* (2008) 164 Cal.App.4th 289, 299 ["*Autumn H.* does not narrowly define or specifically identify the type of relationship necessary to establish the exception"].) Certainly, it is not necessary — even if it were possible — to calibrate a precise "quantitative measurement of the specific amount of 'comfort, nourishment or physical care' [the parent] provided during [his or] her weekly visits." (*Brandon C.*, *supra*, at p. 1538.) As in this case, often expert psychologists who have observed the child and parent and can synthesize others' observations will be an important source of information about the psychological importance of the relationship for the child.[4]

Concerning the third element — whether "termination would be detrimental to the child due to" the relationship — the court must decide whether it would be harmful to the child to sever the relationship and choose adoption. (§ 366.26, subd. (c)(1)(B); see also § 366.26, subd. (c)(1)(D).) Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship. (See *In re C.B.* (2010) 190 Cal.App.4th 102, 128; *In re Noreen G.* (2010) 181 Cal.App.4th 1359, 1391; see also *Troxel v. Granville* (2000) 530 U.S. 57, 66–67.) What courts need to determine, therefore, is how the child would be affected by losing the parental relationship — in effect, what life would be like for the child in an adoptive home without the parent in the child's life. (Cf. *In re Celine R.* (2003) 31 Cal.4th 45, 55 [explaining, in

---

[4] Both the trial and the appellate courts found the bonding study informative. Trial courts should seriously consider, where requested and appropriate, allowing for a bonding study or other relevant expert testimony.

discussing the "sibling relationship exception" (§ 366.26, subd. (c)(1)(B)(v)), "the court should carefully consider all evidence regarding the sibling relationship as it relates to possible detriment to the adoptive child"].) As the expert who performed the bonding study in this case suggested, the effects might include emotional instability and preoccupation leading to acting out, difficulties in school, insomnia, anxiety, or depression. Yet as the experts in this case discussed, a new, stable home may alleviate the emotional instability and preoccupation leading to such problems, providing a new source of stability that could make the loss of a parent not, at least on balance, detrimental.

In each case, then, the court acts in the child's best interest in a specific way: it decides whether the harm of severing the relationship outweighs "the security and the sense of belonging a new family would confer." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) "If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that," even considering the benefits of a new adoptive home, termination would "harm[]" the child, the court should not terminate parental rights. (*Ibid.*) That subtle, case-specific inquiry is what the statute asks courts to perform: does the benefit of placement in a new, adoptive home outweigh "the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]" (*In re S.B.*, *supra*, 164 Cal.App.4th at p. 300.) When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be "detrimental to the child *due to*" the child's beneficial relationship with a parent. (§ 366.26, subd. (c)(1)(B)(i), italics added.) We don't address here what it means

for termination to be detrimental *due to* any of the other listed exceptions. That inquiry may well differ depending on the particular exception at issue. (See § 366.26, subd. (c)(1)(B)(ii)–(vi).)

When it weighs whether termination would be detrimental, the court is not comparing the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s). Nothing that happens at the section 366.26 hearing allows the child to return to live with the parent. (See *Zeth S.*, *supra*, 31 Cal.4th at p. 411.) Accordingly, courts should not look to whether the parent can provide a home for the child; the question is just whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home. (See *Amber M.*, *supra*, 103 Cal.App.4th at p. 690 [finding error in not applying exception based on social worker's testimony that "focus[ed] on [parent's] inability to provide a home for [the children] and on the suitability of the current placements"].) Even where it may never make sense to permit the child to live with the parent, termination may be detrimental. (See *Scott B.*, *supra*, 188 Cal.App.4th at pp. 471–472.) And the section 366.26 hearing is decidedly not a contest of who would be the better custodial caregiver. (See *Brandon C.*, *supra*, 71 Cal.App.4th at pp. 1537–1538.)

What's more, understanding the harm associated with severing the relationship is a subtle enterprise — sometimes depending on more than just how beneficial the relationship is. In many cases, "the strength and quality of the natural parent/child relationship" will substantially determine how detrimental it would be to lose that relationship, which must be weighed against the benefits of a new adoptive home. (*Autumn*

*H.*, *supra*, 27 Cal.App.4th at p. 575.) A child would benefit from continuing a strong, positive, and affirming relationship, and it would be destabilizing to lose that relationship. Sometimes, though, a relationship involves tangled benefits and burdens. In those cases, the court faces the complex task of disentangling the consequences of removing those burdens along with the benefits of the relationship.

This is a case in point. The experts agreed that Caden's relationship with Mother had potentially negative features. Dr. Molesworth indicated that Caden's bond to Mother might be "narrow": Caden was preoccupied with Mother in a way that could impede forming other relationships. And Dr. Lieberman highlighted this aspect of the relationship. They disagreed, though, about how negative this feature actually was. Dr. Molesworth thought the "narrow" bond had not in fact impeded Caden from forming other relationships. Dr. Lieberman opined that it had. And most relevantly for whether termination would be detrimental, the experts disagreed about the effects of severing the relationship given Caden's preoccupation with Mother. Dr. Molesworth opined that termination could be more detrimental on account of Caden's preoccupation than if Caden were less preoccupied with Mother. Dr. Lieberman, on the other hand, opined that termination could, in this respect, even be beneficial because it would allow Caden to focus on other relationships or activities. The trial court seems to have credited Dr. Molesworth on the ground that Dr. Lieberman hadn't interviewed or met with Caden. A different court in a different case could find as the trial court did here that a potentially or actually negative aspect of a relationship might make termination even more detrimental. It could also find that terminating a relationship with negative aspects would have

some positive effects that weigh in the balance — and may tip it in favor of severing the parental relationship to make way for adoption.

To gauge and balance these weights can be a daunting prospect for trial courts. But it's what the statute requires — and the legislative history confirms it. In interpreting the dependency scheme in general and section 366.26 in particular, we have regularly looked to the report of the "Task Force," which the Legislature created in 1987 to redesign the dependency system and whose recommendations the Legislature adopted. (See *Cynthia D.*, *supra*, 5 Cal.4th at p. 247; Sen. Select Com. on Children & Youth, Rep. on Child Abuse Reporting Laws, Juvenile Court Dependency Statutes, and Child Welfare Services (Jan. 1988) p. i (hereafter Task Force Report).) The Task Force explained why the parental-benefit exception existed and when it should be applied: "Termination would not be permissible, however, in the following situation[]: [¶] a) Termination would be detrimental to the child due to the strength of the parent-child relationship. There is substantial clinical evidence that some children in foster care retain very strong ties to their biological parents. Since termination in such situations is likely to be harmful to the child, courts should retain parental ties if desired by both the parents and the child." (Task Force Report, *supra*, at p. 11, underscoring omitted.)

The history of the statute also underscores that these three elements — visitation, a beneficial relationship, and detriment from losing it — are what the parent has to prove. Subsequent to *Autumn H.*, the Legislature amended the statute to require a parent to show a "*compelling* reason for determining that termination would be detrimental to the child . . . ." (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B), italics added; see Stats.

1998, ch. 1056, § 17.1.)  Based on this amendment, some courts suggested that parents must prove something more than *Autumn H.* required, some heightened level of harm or an additional "compelling reason."  (See *Caden C.*, *supra*, 34 Cal.App.5th at pp. 113–114; *In re Logan B.* (2016) 3 Cal.App.5th 1000, 1012; *Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1349; *In re Casey D.* (1999) 70 Cal.App.4th 38, 51.)  But closer examination of the legislative history of this amendment reveals the change does not impose an additional or heightened showing.  The Legislature added the "compelling reason" language in section 366.26 and throughout the Welfare and Institutions Code to comply with the new Adoption and Safe Families Act of 1997 (ASFA).  (Pub.L. No. 105-89 (Nov. 19, 1997) 111 Stat. 2115; see Stats. 1998, ch. 1056, § 27; Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 2773 (1997–1998 Reg. Sess.) as amended Aug. 24, 1998, p. 1 ["This bill conforms state law to the recently enacted Public Law 105-89, the Adoptions [*sic*] and Safe Families Act"].)  That federal statute required a "compelling reason" in particular situations when an agency didn't move to terminate parental rights, or a court declined to terminate parental rights within specified timeframes.  (See 42 U.S.C. § 675(5)(C), (E)(ii).)

But ASFA didn't specify what would count as a "compelling reason."  The Legislature accordingly specified that existing reasons in the statute to delay setting a Welfare and Institutions Code section 366.26 hearing or not to terminate parental rights were in fact compelling reasons as required by ASFA.  (See, e.g., Welf. & Inst. Code, §§ 366.21, subd. (g)(1)(C)(i), (5), 366.22, subd. (a)(3), 366.3, subd. (h)(1).)  The addition of "compelling" in Welfare and Institutions Code section 366.26, subdivision (c)(1)(B) is another such example and just clarifies

that, for example, the parental-benefit exception is a compelling reason not to terminate parental rights as possibly required by ASFA. In other words, where terminating a child's substantial, positive attachment to the parent would, on balance, be detrimental to the child, that simply is a compelling reason not to terminate parental rights.[5]

What this means is that the parent asserting the parental benefit exception must show, by a preponderance of the evidence, three things. The parent must show regular visitation and contact with the child, taking into account the extent of visitation permitted. Moreover, the parent must show that the child has a substantial, positive, emotional attachment to the parent — the kind of attachment implying that the child would benefit from continuing the relationship. And the parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home. When the parent has met that burden, the parental-benefit exception applies such that it would not be in the best interest of the child to terminate parental rights, and the court should select a permanent plan other than adoption.

---

[5] We now disapprove opinions to the extent they have held to the contrary: *In re Caden C.*, *supra*, 34 Cal.App.5th at pages 109–115; *In re Logan B.*, *supra*, 3 Cal.App.5th at pages 1010–1013; *In re Jasmine D.*, *supra*, 78 Cal.App.4th at page 1349; and *In re Casey D.*, *supra*, 70 Cal.App.4th at page 51. Many opinions have treated the "compelling reason" language as not adding any further or heightened requirement, and they just assess whether termination would be "detrimental," i.e., whether the harm of losing the parental relationship would be offset by the security and stability of a new adoptive family. (See, e.g., *In re E.T.*, *supra*, 31 Cal.App.5th at p. 77.) We understand those opinions to be consistent with our decision today.

(See § 366.26, subd. (c)(4)(A).)  We do not further discuss the steps for selecting such a permanent plan.  (See § 366.26, subd. (c)(4)(A)–(B).)

## B.

We now turn to whether and how a parent's continued struggles with the issues that led to dependency relate to application of the parental-benefit exception.

A parent's continued struggles with the issues leading to dependency are not a categorical bar to applying the exception. As the parties before us all agree, making a parent's continued struggles with the issues leading to dependency, standing alone, a bar to the exception would effectively write the exception out of the statute.  In cases like this one, when the court sets a section 366.26 hearing, it terminates reunification services for the parent. (See § 366.21, subd. (h).)  Thus, when the court holds a section 366.26 hearing, it all but presupposes that the parent has not been successful in maintaining the reunification plan meant to address the problems leading to dependency.  (See also § 366.26, subd. (c)(2)(A) [court shall not terminate parental rights unless court has previously found that, to the extent required by statute, "reasonable services" were offered or provided].)  The parental-benefit exception can therefore only apply when the parent has presumptively *not* made sufficient progress in addressing the problems that led to dependency.  So, we reject the paradoxical proposition, without any basis in the statute or its history, that the exception can only apply when the parent *has* made sufficient progress in addressing the problems that led to dependency.  Parents need not show that they are "actively involved in maintaining their sobriety or complying

substantially with their case plan" (*Caden C., supra*, 34 Cal.App.5th at p. 112) to establish the exception.[6]

But the parties likewise agree on something else: issues such as those that led to dependency often prove relevant to the application of the exception. We agree. A parent's struggles may mean that interaction between parent and child at least sometimes has a " 'negative' effect" on the child. (*Autumn H., supra*, 27 Cal.App.4th at p. 576.) For example, there was some evidence in this case that, perhaps as a result of her mental health issues, Mother sought to undermine at least some of Caden's foster placements, which could certainly have had a negative effect on him. Conversely, a parent who gains greater understanding of herself and her children's needs through treatment may be in a better position to ensure that her interactions with the children have a " 'positive' . . . effect" on them. (*Ibid.*; see *In re E.T., supra*, 31 Cal.App.5th at p. 77 ["the insight [Mother] has into her own development and the love and care she has for her children was clear in her testimony. Mother recognized that her behavior was traumatic for the children . . ."].) In both scenarios, the parent's struggles speak to the benefit (or lack thereof) of continuing the relationship and are relevant to that extent. And issues such as those leading to dependency may also be relevant to the detriment from terminating parental rights. There was some evidence in this case that Mother's continuing substance abuse and mental health issues contributed to Caden forming what might have

---

[6] To the extent these cases held to the contrary, we disapprove of them: *In re Caden C., supra*, 34 Cal.App.5th at pages 110–112; *In re Breanna S., supra*, 8 Cal.App.5th at page 648; *In re Noah G., supra,* 247 Cal.App.4th at page 1304; and *In re Marcelo B., supra,* 209 Cal.App.4th at pages 643–645.

been a "narrow" bond with her. And there was conflicting testimony about whether the nature of Caden's bond to Mother, associated with Mother's substance abuse and mental health issues, would make termination more or less detrimental for Caden.

Nonetheless, the parent's struggles with issues such as those that led to dependency are relevant only to the extent they inform the specific questions before the court: would the child benefit from continuing the relationship and be harmed, on balance, by losing it? The parent's continuing difficulty with mental health or substance abuse may not be used as a basis for determining the fate of the parental relationship by assigning blame, making moral judgments about the fitness of the parent, or rewarding or punishing a parent. (See *Cynthia D.*, *supra*, 5 Cal.4th at p. 254 ["It is not the purpose of the section 366.26 hearing to show parental inadequacy . . . [or] that the parents are 'at fault' "]; see also *Marilyn H.*, *supra*, 5 Cal.4th at p. 305; *Amber M.*, *supra*, 103 Cal.App.4th at p. 690; Goldstein et al., Beyond the Best Interests of the Child (1979) p. 79.)

Nor could a parent's struggles be relevant simply because they might conceivably affect the parent's ability to regain custody of the child. As we have previously explained, return to the parent's custody is not an option at the section 366.26 hearing. (See *Marilyn H.*, *supra*, 5 Cal.4th at pp. 304–305.) Accordingly, whether the parent is or is not "ready for the children's return to her custody" is not, by itself, relevant to the application of the parental-benefit exception. (*Amber M.*, *supra*, 103 Cal.App.4th at p. 690.) If termination of parental rights would, when weighed against the offsetting benefits of an adoptive home, be detrimental to the child, the court should not terminate parental rights, even if the parent has not

demonstrated a likelihood that he or she will ever be able to regain custody.[7] (See *Scott B., supra,* 188 Cal.App.4th at pp. 471–472.)

Mother argues that a parent's struggles should only be relevant to whether the child would benefit from continuing the relationship. They should not be considered "a second time" in deciding whether termination would be detrimental. A parent's struggles may be most directly relevant — as Mother suggests — to the " 'positive' or 'negative' effect of interaction between parent and child" (*Autumn H., supra,* 27 Cal.App.4th at p. 576) and then somewhat more indirectly to the harm of removing such interactions from the child's life. (See also *Zeth S., supra,* 31 Cal.4th at p. 412, fn. 9.) But how and how much the loss of a relationship with a parent may be harmful, how and how much that harm might be offset by a new family are complex questions not always answered just by determining how beneficial the child's relationship with the parent is. Though there is no reason for a court to consider "a second time" the same struggles in the same way, a parent's struggles with substance abuse, mental health issues, or other problems could be directly relevant to a juvenile court's analysis in deciding whether termination would be detrimental.

---

[7] We also now disapprove those opinions that have held issues leading to dependency (1) were relevant in their own right apart from their relevance to the elements of the exception; (2) were relevant because they led to dependency; or (3) were relevant simply because they might keep the parent from regaining custody. (See *In re Caden C., supra,* 34 Cal.App.5th at pp. 110–112; *In re Breanna S., supra,* 8 Cal.App.5th at p. 648; *In re Noah G., supra,* 247 Cal.App.4th at p. 1304; *In re Anthony B.* (2015) 239 Cal.App.4th 389, 397; *In re Marcelo B., supra,* 209 Cal.App.4th at pp. 643–644.)

## C.

When courts make decisions about whether to apply the beneficial relationship exception, their decisions are subject to review. What standard applies is another question we granted review to resolve.

Courts of Appeal have come to use three different standards. Many courts review all the trial court's findings for substantial evidence. (See, e.g., *Autumn H., supra*, 27 Cal.App.4th at p. 575.) Other courts have suggested that the appropriate standard is abuse of discretion because the "juvenile court is determining which kind of custody is appropriate for the child." (*Jasmine D., supra*, 78 Cal.App.4th at p. 1351 [analogizing § 366.26 hearing to custody determinations at other stages of dependency proceedings].) And yet others, including the Court of Appeal in this case, have adopted a "hybrid" standard. They review whether there has been regular visitation and whether there is a beneficial relationship for substantial evidence but whether termination would be detrimental for abuse of discretion. (See *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314–1315.)

We agree with the general consensus: a substantial evidence standard of review applies to the first two elements. The determination that the parent has visited and maintained contact with the child "consistently," taking into account "the extent permitted by the court's orders" (*Brandon C., supra*, 71 Cal.App.4th at p. 1537) is essentially a factual determination. It's likewise essentially a factual determination whether the relationship is such that the child would benefit from continuing it.

The third element — whether termination of parental rights would be detrimental to the child — is somewhat different. As in assessing visitation and the relationship between parent and child, the court must make a series of factual determinations. These may range from the specific features of the child's relationship with the parent and the harm that would come from losing those specific features to a higher-level conclusion of how harmful in total that loss would be. The court must also determine, for the particular child, how a prospective adoptive placement may offset and even counterbalance those harms. In so doing, it may make explicit or implicit findings ranging from specific benefits related to the child's specific characteristics up to a higher-level conclusion about the benefit of adoption all told. All these factual determinations are properly reviewed for substantial evidence. (See *In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067 (*Robert L.*) ["evaluating the factual basis for an exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling"].)

Yet the court must also engage in a delicate balancing of these determinations as part of assessing the likely course of a future situation that's inherently uncertain. The decision is not the same as a determination whether to transfer the child from the custody of one caregiver to another, but it does require assessing what the child's life would be like in an adoptive home without the parent in his life. (Cf. *In re Stephanie M.* (1994) 7 Cal.4th 295, 317–318 (*Stephanie M.*).) The court makes the assessment by weighing the harm of losing the relationship against the benefits of placement in a new, adoptive home. And so, the ultimate decision — whether termination of parental rights would be detrimental to the child due to the child's

relationship with his parent — is discretionary and properly reviewed for abuse of discretion.

In reviewing factual determinations for substantial evidence, a reviewing court should "not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts." (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.) The determinations should "be upheld if . . . supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence." (*Ibid.*; see also 9 Witkin, Cal. Procedure (5th ed. 2020) Appeal, § 365.) Uncontradicted testimony rejected by the trial court " 'cannot be credited on appeal unless, in view of the whole record, it is clear, positive, and of such a nature that it cannot rationally be disbelieved.' " (*Adoption of Arthur M.* (2007) 149 Cal.App.4th 704, 717.)

Review for abuse of discretion is subtly different, focused not primarily on the evidence but the application of a legal standard. A court abuses its discretion only when " ' "the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination." ' " (*Stephanie M.*, *supra*, 7 Cal.4th at p. 318.) But " ' "[w]hen two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' " (*Id.* at p. 319; see also *Robert L.*, *supra*, 21 Cal.App.4th at p. 1067 ["The reviewing court should interfere only ' "if . . . under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he [or she] did" ' "].)

While each standard here fits a distinct type of determination under review, the practical difference between the standards is not likely to be very pronounced. Review for substantial evidence applies to factual determinations; abuse of discretion applies when a lower court must delicately balance factual determinations to assess an uncertain future situation. But where, as with the parental-benefit exception, "the appellate court will be evaluating the *factual basis* for an exercise of discretion, there likely will be no practical difference in application of the two standards." (Eisenberg & Hepler, Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2020) ¶ 8:88; see also *Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1351 ["The practical differences between the two standards of review are not significant"].) At its core, the hybrid standard we now endorse simply embodies the principle that "[t]he statutory scheme does not authorize a reviewing court to substitute its own judgment as to what is in the child's best interests for the trial court's determination in that regard, reached pursuant to the statutory scheme's comprehensive and controlling provisions." (*Zeth S.*, *supra*, 31 Cal.4th at p. 410.)

## III.

Having explained the scope of the parental-benefit exception and the standard for reviewing an application of it, we turn to the Court of Appeal's decision in this case. The Court of Appeal found substantial evidence supported the trial court's determinations that Mother had maintained regular visitation with Caden. (*Caden C.*, *supra*, 34 Cal.App.5th at pp. 108–109.) It also found that substantial evidence supported the trial court's determination that Caden and Mother had a beneficial relationship. (*Id.* at p. 109.) It held, though, that the trial court abused its discretion in finding that the relationship was a

compelling reason not to terminate parental rights. (*Id.* at pp. 110–115.)

The Court of Appeal rested its decision to reverse on two considerations. First, it concluded that mother had not " 'maintain[ed] her sobriety and address[ed] her mental health issues.' " (*Caden C.*, *supra*, 34 Cal.App.5th at p. 110.) It therefore held that "[n]o reasonable court would apply the beneficial relationship exception on this record of mother's disengagement from treatment and case plan, inability or unwillingness to remain sober, and deficient insight regarding her parenting." (*Id.* at p. 112.) Second, it reasoned that "although Caden enjoyed visiting with mother, their interactions were often detrimental to his well-being" (*id.* at p. 114) by contrast with his relationship with Ms. H., "the *only* caregiver in Caden's life who had enabled him 'to feel that he is in the care of a consistent and predictable adult who keeps him safe and reliably looks out for his physical and emotional needs' " (*id.* at p. 115). It therefore concluded that "when the strength and quality of mother's relationship with Caden in a tenuous placement is *properly* balanced against the security and sense of belonging adoption by Ms. H. would confer, no reasonable court could have concluded that a compelling justification had been made for forgoing adoption." (*Ibid.*, italics added.)

The first consideration supporting reversal was improper. Even where a parent continues to struggle with addiction — and even if she believes that her addiction doesn't make her an unfit parent — a reasonable court could conclude that termination of parental rights would, on balance, be detrimental to the child. (See *Caden C.*, *supra*, 34 Cal.App.5th at p. 111.) Mother was not required, in order to establish that the parental-benefit

exception applied, to put evidence in at the section 366.26 hearing that she had recently attempted to maintain her sobriety or seek treatment for her addiction or mental health issues. (See *Caden C.*, at p. 111.) The Court of Appeal did not conclude, applying the appropriate standard of review, that the evidence showed Mother's substance abuse or mental health issues affected whether her relationship with Caden was beneficial or whether its loss would, on balance, be detrimental to him. The Court of Appeal did not, for example, connect Mother's substance abuse or mental health to its emphasis on contested evidence about whether Caden's visits with Mother "were often detrimental to his well-being." (*Id.* at p. 114.) It also did not explain how its reliance on that contested evidence fit with its determination that "it cannot be seriously disputed that Caden had a beneficial relationship with mother — that is, a significant relationship the termination of which would cause him detriment." (*Id.* at p. 109.) And so, the Court of Appeal's holding that no reasonable court could apply the parental-benefit exception given Mother's substance abuse and mental health issues was error.

Because we find that the Court of Appeal's first consideration was erroneous, we reverse. Accordingly, we do not address the court's second consideration in detail. In particular, we don't decide whether the Court of Appeal failed to view "all the evidence, . . . most favorably in support of the trial court's actions" (*Robert L.*, *supra*, 21 Cal.App.4th at p. 1067) or improperly "substitute[d] its own judgment" (*Zeth S.*, *supra*, 31 Cal.4th at p. 410) for the trial court's.

The juvenile court declined to terminate parental rights nearly three years ago. We now hold that the Court of Appeal, in reversing that decision, erred. And so, we reverse the Court

of Appeal. More recently, the Agency filed a new petition to terminate parental rights, and the trial court held a new hearing and terminated Mother's parental rights. That subsequent decision renders moot the earlier decision not to terminate parental rights. On remand, the Court of Appeal should therefore dismiss this appeal as moot. (See *People v. DeLeon* (2017) 3 Cal.5th 640, 660.)

## IV.

The dependency statutes were enacted to prevent harm to children. They prevent harm at the outset of the dependency process by removing children from situations where they are likely to suffer abuse or neglect. But they also prevent harm in the process of selecting permanent placement through the parental-benefit exception, by allowing certain children to preserve emotionally important parental relationships. This exception allows a child a legal basis for maintaining a relationship with the child's parent if severing that relationship would, on balance, harm the child. The exception preserves the child's right to the relationship even when the child cannot safely live with that parent. What it does not allow is a judgment about the parent's problems to deprive a child of the chance to continue a substantial, positive relationship with the parent. Accordingly, we reverse the judgment of the Court of Appeal and remand with directions to dismiss the appeal as moot.

**CUÉLLAR, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  In re Caden C.

___

**Procedural Posture** (see XX below)

**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 34 Cal.App.5th 87
**Review Granted (unpublished)**
**Rehearing Granted**

___

**Opinion No.** S255839
**Date Filed:**  May 27, 2021

___

**Court:**  Superior
**County:**  San Francisco
**Judge:**  Monica F. Wiley

___

**Counsel:**

Dennis J. Herrera, City Attorney, Kimiko Burton, Lead Attorney; Gordon-Creed, Kelley Holl and Sugerman, Jeremy Sugerman and Katie Curtis for Plaintiff and Appellant.

Jennifer Henning; Thomas E. Montgomery, County Counsel (San Diego), Caitlin E. Rae, Chief Deputy County Counsel, and Tahra C. Broderson, Deputy County Counsel, for California State Association of Counties as Amicus Curiae on behalf of Plaintiff and Appellant.

Deborah Dentler, under appointment by the Supreme Court, for Appellant.

Janet G. Sherwood for Advokids, East Bay Children's Law Offices and Legal Services for Children as Amici Curiae on behalf of Appellant.

Stacie Hendrix and Leslie Starr Heimov for Children's Law Center of California, Legal Advocates for Children and Youth and Children's Legal Services of San Diego as Amici Curiae on behalf of Appellant.

Leslie A. Barry, under appointment by the Supreme Court, and Nicole Williams, under appointment by the Court of Appeal, for Defendant and Respondent Christine C.

Sharon Petrosino, Public Defender (Orange), and Brian Okamoto, Deputy Public Defender, for California Dependency Trial Counsel as Amicus Curiae on behalf of Defendant and Respondent Christine C.

NYU School of Law Family Defense Clinic, Amy Mulzer; Jarvis Legal Services and Michelle L. Jarvis for Professors of Family and Clinical Law as Amicus Curiae on behalf of Defendant and Respondent Christine C.

Michelle Danley, under appointment by the Supreme Court, for Defendant and Respondent Brian C.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Leslie A. Barry
650 Park Rd.
Mays Landing, NJ 08330
(714) 206-3374

Jeremy Sugerman
Gordon-Creed, Kelley Holl and Sugerman
1901 Harrison St., 13th floor
Oakland, CA 94612
(415) 969-6754

Deborah Dentler
510 S. Morengo Ave.
Pasadena, CA 91101
(805) 318-1146