Filed 6/26/24  In re S.M. CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re S.M. et al., Persons Coming Under Juvenile Court Law. | B332822 |
| _____ LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. C.M. et al., Defendants and Appellants. | (Los Angeles County Super. Ct. No. 19CCJP05242AB) |

APPEAL from orders of the Superior Court of Los Angeles County, Lisa A. Brackelmanns, Commissioner.  Affirmed.

Donna P. Chirco, under appointment by the Court of Appeal, for Defendant and Appellant C.M.

Suzanna Davidson, under appointment by the Court of Appeal, for Defendant and Appellant S.M.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Stephen Watson, Deputy County Counsel, for Plaintiff and Respondent.

_____

C.M. (mother) and S.M. (father) appeal from the juvenile court's orders terminating their parental rights over their son and daughter.  They argue the court erred in refusing to apply the beneficial parent-child relationship exception (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i)).[1]  We affirm.

## FACTS AND PROCEDURAL BACKGROUND

### I.    Facts

Mother and father married in 2008, and have two children together, son (born 2013) and daughter (born 2018).  At all relevant times, son and daughter lived in the home of maternal grandparents.  Mother and father have a history of domestic violence.  For example, in 2008, father and mother got into a fight in which mother's leg was broken, requiring surgery.  Father "punches, slaps," "chokes," and bites mother, and then threatens to report her and her family to immigration authorities if she reports his abuse.  Son has autism and receives counseling for anxiety he has that stems from father's violence against mother.

On July 29, 2019, father choked mother so badly that she could not eat for a day because her throat was in so much pain.  On August 3, 2019, father got ahold of mother's cell phone and saw subject matter concerning mother and another man that made father angry.  Father choked mother, threw her on the bed, and punched her back 10-20 times in front of their then 19-

_____

[1]    All statutory references are to the Welfare and Institutions Code.

2

month-old daughter and 6-year-old son. Father's violence left mother with bruises on her neck, chest, and back, and scratches on her forehead and hand. Mother called 911, and father was arrested. Father and mother were living with maternal grandparents at the time, but father was in the process of moving out.

On August 5, 2019, mother got a restraining order to protect herself, the children, her parents, and her sister from father (mother was residing with her parents). A three-year restraining order was issued on September 5, 2019. Father continuously denied touching mother during the incident on August 3, 2019, and described himself as "nothing but caring and loving."

## II. *Procedural Background*

### A. Section 300 petition

On August 15, 2019, the Department of Children and Family Services (Department) filed a petition asking the juvenile court to exercise jurisdiction over son and daughter under section 300, subdivisions (a) and (b) based on mother and father's history of physical altercations in front of their children.

On August 16, 2019, the juvenile court ordered the children detained from father and released them to mother's custody.

Son enrolled in therapy in September 2019, and during sessions he disclosed he had seen father push mother down the stairs. Son was diagnosed with ADHD and was prescribed Adderall.

Mother enrolled in a domestic violence support group in October 2019.

On January 15, 2020, the juvenile court sustained the petition based on domestic violence, ordered the children removed

3

from father and placed with mother, and granted father monitored visitation. The court also ordered reunifications services for both parents, including individual counseling, parenting, and domestic violence groups.

In March 2020, father was convicted of misdemeanor corporal injury to a spouse and was sentenced to 90 days in jail and three years of probation with conditions.

Mother began attending parenting classes in May 2020.

As of June 2020, father had not enrolled in any of his court ordered services, and had missed 11 of the 30 scheduled monitored visits. At the visits father did attend, father was "affectionate and loving towards his children," and the children were "happy and excited to visit with their father."

As of June 2020, son was improving his skills of coping with anger and expressing his emotions, and had become more attentive since taking ADHD medication. Daughter's vocabulary was increasing, and she was participating in speech therapy.

Father was hospitalized on July 1, 2020, after his sister found him unresponsive. The same month, father was arrested for "corporal injury to a spouse."[2]

In August 2020, father was released from jail, and he and mother stayed together in a hotel in violation of the restraining order. After this incident, son went from being "very open during [therapy] sessions" to being "very closed off and guarded." Son reported that "mommy will hit me with a belt" if he talks about

---

[2] This information is contained in the Department's Application and Declaration in Support of Removal, filed October 13, 2020. Based on the father's "rap sheet," however, it appears the "arrest" may have been for a violation of probation involving violations of a restraining order and drug use.

4

father during therapy. He repeated this statement "5-8 times." Son stated he "couldn't tell" the therapist if mother had hit him recently.

In September 2020, son reported to the Department that mother hits him and that, when she does, he protects his face and head with his arms. He stated that mother hit both him and his then two-year-old sister with a belt.

**B.     Subsequent petitions under section 342 and 387**

On October 2020, the Department filed petitions under sections 342 and 387, alleging mother physically abused the children, father abuses methamphetamine and alcohol, and mother fails to protect the children from father instead allowing him unlimited access to them.

**C.     Adjudication of subsequent petitions**

In March 2021, the juvenile court sustained the allegations in the petitions filed under sections 342 and 387, ordered the children removed from mother's custody, and granted both parents monitored visitation (with parents to visit separately) of six hours per week, and continued reunification services for both parents.

**D.     Six- to 12-month review period**

Son and daughter continued to reside with maternal grandparents, who shared their residence with maternal aunt and uncle. Mother moved into a hotel with father, in spite of the restraining order.

In September 2021, son and daughter were "thriving and . . . happy" in the home of maternal grandparents, who expressed their desire to adopt the children. Father continued to decline participating in court-ordered services, and was a "no show" to most of his drug tests. Mother's visits were "going well" and

5

mother was "loving towards her children."  Father attended most of his visits, and was "affectionate and loving towards his children."  The children were "happy and excited" to visit with father.

At the six-month review hearing on September 29, 2021, the juvenile court found the parents' progress towards alleviating the causes necessitating removal of their children to be insubstantial and continued reunification services.

In January 2022, maternal family reported that mother had asked her sister to stay with mother for the weekend "because [mother] feared being at home alon[e] after an argument with [father]."  Mother and father "were living together" "in [m]otels and in the community."

The restraining order "was modified to allow peaceful contact" between mother and father in February 2022.

In March 2022, son and daughter continued to be "well taken care of by their maternal grandparents," who were "very proactive and involved in addressing the needs of the children."  The children had "a good bond" with maternal grandparents.  Son's behavior had improved, and daughter's speech "improved significantly."  Mother and father continued to visit their children consistently, and visits were going well.  However, mother was "on her phone often during the visits."  Father did not attend any drug testing during this period, nor did he enroll in counseling.  The Department recommended the court terminate reunification services for both parents.

At the 12-month review hearing in May 2022, the juvenile court ordered further reunification services for parents and found it would be detrimental to return the children to mother and father.

### E.  18-month review period

In October 2022, the Department reported the children had a "strong bond" with maternal grandparents and aunt, "continue[d] to thrive" in their home.  Daughter had become potty trained, started preschool, and begun to speak in full sentences.  Mother and father had only "sporadic" contact with the Department.  Father relied on mother to communicate with the Department on his behalf, despite the Department explaining that was not acceptable.  Son "appeared to be happy" at home with maternal grandmother and aunt, but "randomly mention[ed]," unenthusiastically, that he would like to return home, which "appears to be a coached statement."  Daughter was too young to state her needs.  Mother's visitation with the children was "inconsistent," and mother did not cook for the children, sometimes failed to engage with them, and declined to help them with their homework.  Instead, she watched television, occupied herself with her phone, made demands of maternal grandmother, and argued with maternal grandmother in the children's presence.  Maternal grandmother requested the visits be moved outside her home and with a visitation schedule, because mother was taking time away from the children's studies and leaving them "agitated or anxious" from her visits.  Maternal grandmother reported that "father is emotionally unstable[,] and has [a] mental health history and anger issues that have not been addressed."

At the November 2022 18-month review hearing, the juvenile court found that parents' progress had been "unsubstantial," but nonetheless continued their reunification services.  The court also ordered that parents could attend two of

7

their six monitored visitation hours together.  The permanency planning hearing was scheduled for May 2023.

### F.    Permanency review period

In November and December 2022, parents had visits with the children at their home "without . . . requesting authorization" from the Department.

In December 2022, son expressed that he "does not trust his father because of the [domestic violence] between the parents and feels guilty of the removal from his parents."  Son felt parents were "pressuring him to talk when they talk about reunifying" during family therapy sessions.  Maternal grandmother reported that parents pick the children up right when they get home from school before maternal grandmother has time to prepare them a snack, and then parents fail to feed the children, who return from the visits still hungry.  Children were "misbehaving at home after their visits" with mother and father, and were having "mood swings" at school and at home.  Although son reported "lik[ing] his visits with his parents," he became anxious and irritable after such visits.  Son returned from visits with his parent "upset," but refused to state why he was upset.

Between January and May 2023, the children continued to thrive in maternal grandparents' care.  Both children reported being "comfortable living with their grandparents."  Son "present[s] fears of loud noises, yelling and screaming, helicopters patrolling at night and nightmares."  Son "continue[d] to struggle with the trauma of seeing the domestic violence between the parents," and "changed his medication to help with [his] fears . . . of observing [the violence]."  "Children do not . . . ask about . . . their parents when they do not visit."  At times, daughter "fights

8

to talk on the phone, taking up much of the time" on the phone with mother, and at other times, both children decline to speak on the phone. Parents showed no "understand[ing] . . . that they have traumatized their son," nor did they show that "father has addressed his mental health or . . . mother's codependency." The Department recommended terminating reunification services.

At the permanency review hearing on June 21, 2023, the juvenile court found parents' progress had been "unsubstantial," terminated reunification services, and scheduled a permanency planning hearing for October 2023.

After the June 2023 hearing, "the children expressed relief" "[o]nce the court terminated the reunification [services]," and felt more "at ease without anxiety," knowing "they would remain" in maternal grandparents' home. The children sometimes did "not want to go" to visits with parents, and were "fine not visiting the parents." The children did not show a strong attachment to parents, and saw the visits "as play time." Daughter identified maternal aunt "as the mother" and has "a very strong attachment" with maternal aunt. The children "have limited contact with the parents." Mother calls the children, but they "do not show much interest as they stay busy with their daily activities." Sometimes the children "look forward to their visits," but other times they "request to go home."

### G. Permanency planning hearing

At the permanency planning hearing on October 12, 2023, the Department entered into evidence its reports, father's declaration, notes from father's visitation supervised by a family visitation center, and letters from his service providers describing his participation. Mother's counsel argued that the beneficial parent-child relationship exception applied (§ 366.26, subd.

9

(c)(1)(B)(i)). Father's counsel made a similar argument. Both the children's counsel and the Department asked the court to terminate parental rights, arguing that neither parent satisfied any exception to termination. The court found that the parents had not maintained regular visitation[3] and had not established a bond with the children, and that "any benefit accruing to the children from their relationship with the parents is outweighed by the physical and emotional benefit the children will receive" through permanency. Finding that no exception applied, the juvenile court terminated parental rights.

Mother and father filed timely notices of appeal.

## DISCUSSION

Mother and father each challenge the juvenile court's termination of their parental rights on the ground that the court erred in finding inapplicable the beneficial parent-child relationship exception.

---

[3] Father argues that the reporter's transcript reflects a finding of regular visitation, and that it controls over the minute order's indication otherwise. The reporter's transcript does not reflect a finding of regular visitation, however. The juvenile court merely stated that "although the parents have visited . . . , they are still monitored visits, and . . . the court is considering the amount of time they've been spending with the children, which is . . . two hours per week, and the quality of the visits." This statement is not inconsistent with the court's finding of no regular visitation as reflected in the minute order, particularly given that the parents had each been allotted six hours of monitored visitation per week.

10

Once a juvenile court has terminated reunification services, it "shall terminate parental rights" if it finds, "by clear and convincing" evidence "that it is likely the child will be adopted" within a reasonable time. (§ 366.26, subds. (a) & (c)(1).) Thus, a juvenile court must terminate parental rights and order adoption unless the parent opposing termination proves that one of six statutory exceptions applies. (§ 366.26, subds. (c)(1) & (c)(1)(B).)

The exception at issue here is the beneficial parent-child relationship exception, which "applies in situations where a child cannot be in a parent's custody but where severing the child's relationship with the parent, even when balanced against the benefits of a new adoptive home, would be harmful for the child." (*In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*).) A court may only find the exception applicable if the parent establishes "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Id.* at. pp. 631, 635.) We review the juvenile court's findings on the first two elements (visitation and relationship) for substantial evidence, and its ruling regarding the balancing of detriment versus benefit for abuse of discretion. (*Id.* at pp. 639-640.)

Although the parties dispute whether substantial evidence supports the juvenile court's finding of no regular visitation by parents, we need not resolve that dispute. Nor do we need to address the evidence showing children's "substantial, positive, [and] emotional attachment" to their parents, because—even if we assume there was such an attachment—we conclude that the juvenile court did not abuse its discretion in finding that terminating parental rights would not be detrimental to the

11

children after weighing the degree of their attachment to parents against the benefits of being adopted by maternal grandparents.

The children spent their whole lives living with maternal grandparents. Although mother and father lived with maternal grandparents and the children before the children were detained (and ultimately removed) from their care, the quality of visits and the impact of the visits on the children were not always positive. Mother engaged in arguments with maternal grandmother, and she left the children feeling "agitated or anxious" after visits. The children returned from visits with both parents hungry. The children misbehaved and had "mood swings" after visits with parents. Son returned from visits, "upset," but refusing to state why. Further, children did not ask about parents, sometimes did not want to visit them, and were "fine not visiting parents." The children thrived under the care of their maternal grandparents. Son made progress in coping with his emotions through therapy, and daughter improved her vocabulary and speech. Although son had been coached to relate that he wanted to return to his parents, he had been thoroughly traumatized by the domestic violence he had witnessed between parents, and both children expressed relief when reunification services were terminated because it eased their anxiety over the prospect of leaving maternal grandparents' home. The children "stayed busy with their daily lives," and did "not show much interest" when mother called them. At times, the children "request[ed] to go home" from visits. We cannot say that the juvenile court here abused its discretion in finding that the benefits to the children of being adopted outweighed the loss of their relationships with parents.

12

Mother resists our conclusion citing *In re Amber M.* (2002) 103 Cal.App.4th 681 (*Amber M.*) and *In re S.B.* (2008) 164 Cal.App.4th 289 (*S.B.*). Neither of these cases impacts our analysis. Unlike the children here, the children in *Amber M.* had been in the care of mother—and not their maternal grandmother caregiver—for significant portions of their lives. (*Amber M.*, at p. 689.) The record included a psychologist's opinion after conducting a bonding study that mother and her daughter shared "a primary attachment." (*Ibid.*) The son "had difficulty separating from" mother. (*Ibid.*) As discussed above, the children here did not view parents as their parents, but rather as playmates. The children sometimes wanted to end visits, and were fine with missing the visits altogether. In *S.B.*, the juvenile court exerted jurisdiction over a child due to her parents' substance abuse, and ultimately terminated parental rights in favor of adoption by the maternal grandmother. (*S.B.*, *supra*, 164 Cal.App.4th at pp. 293, 296.) The court of appeal reversed, observing that father, a veteran who suffered from severe health problems and PTSD, "complied with every aspect of his case plan," and the child "display[ed] a strong attachment" to her father during visits, including whispering "I love you" to him and stating, "I'll miss you" when visits ended; spontaneously stating her desire to live with him; and showing physical affection, such as sitting on his lap and asking him to pick her up. (*S.B.*, at p. 298.) Such strong displays of affection and attachment are not present in this record.

### DISPOSITION

The orders terminating mother's and father's parental rights are affirmed.

LEE, J.*

WE CONCUR:

MOOR, Acting P. J.

KIM, J.

---

\*      Judge of the San Bernardino County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

14